**FOUNDATION ON ECONOMIC TRENDS, et al., Appellants,**

v.

**Richard LYNG, Secretary of Agriculture, et al.**

No. 86–5452.

United States Court of Appeals, District of Columbia Circuit.

Argued March 3, 1987.

Decided May 1, 1987.

Edward Lee Rogers, New York City, for appellants.

Elizabeth Ann Peterson, Atty., Dept. of Justice, with whom Joseph E. diGenova, U.S. Atty., Martin W. Matzen and J. Carol Williams, Attys., Dept. of Justice, Washington, D.C. were on the brief, for appellees.

Before MIKVA, STARR and WILLIAMS, Circuit Judges.

Opinion for the Court filed by Circuit Judge STARR.

STARR, Circuit Judge:

This appeal brings before us the question of whether the United States Department of Agriculture (USDA or Department) is required to prepare a programmatic environmental impact statement (EIS) in connection with the Department's animal productivity research. Concluding that an EIS was not required, the District Court granted the Department's motion for summary judgment. We affirm.

### 1

Congress has authorized and directed the Secretary of Agriculture "to conduct and to stimulate research into the laws and principles underlying the basic problems of agriculture in its broadest aspects." 7 U.S.C. § 427 (1982). Expressly included in this broad mandate is the authority to research new and improved methods of animal breeding and production. *Id.* To fulfill its statutory obligation, USDA employs scientists to conduct inhouse research and provides grant funds for research at eligible institutions.

a. The Agricultural Research Service (ARS) is USDA's major in-house research arm. One of ARS's six main research areas [1] is animal productivity research, which constitutes approximately 20 percent of ARS's budget. This productivity research is directed to six different areas: Genetics and Breeding; Reproduction; Nutrition; Disease; Insects, Ticks and Mites; and Systems.[2] Within each of those six categories, ARS conducts a wide range of projects. To illustrate the variety of these projects, a five-percent representative sample of the single category of Genetics and Breeding includes research into: (1) use of embryo transfer to determine maternal effects and produce multiple births in beef cattle; (2) improving lamb production through integrated reproduction management; and (3) inheritance of endogenous viral genes and their effect on the occurrence of tumorous growths in poultry. Supplemental J.A. at 55–60. The breadth of this work is explained in part by the different needs of USDA and other regulatory agencies,[3] requests from national commodity and user groups, and directives from Congress, all of which influence ARS's research priorities.

b. In addition to its in-house research, USDA administers grants for agricultural research, largely through the Cooperative State Research Service (CSRS). CSRS funding provides only partial support (20 percent of a project's total cost on a national average). Institutional grantees, typically land-grant colleges and universities across the Nation, determine the type and scope of the research conducted. CSRS requires only that the research be agricultural in nature.

c. To transmit findings from these research programs to the scientific community and the interested public, USDA engages in extensive information dissemination activities. Through such publicity efforts, USDA helps ensure that new technologies will be implemented in practical settings.

### 2

Appellants, a variety of individuals and public interest groups,[4] brought this action in United States District Court, claiming that USDA violated the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321, *et seq.* (1982), by failing to prepare an EIS on its animal productivity research. The complaint was broad in sweep; indeed, the precise contours of appellants' challenge were highly difficult for the District Court to discern. Having reviewed the record, we understand full well the District Court's expressed uncertainty as to appellants' exact claims, notwithstanding the court's assiduous efforts to clarify and sharpen the issues.

---

**1.** The six areas of research include Soil and Water Conservation, Plant Production, Animal Productivity Research, Commodity Conversion and Delivery, Adequate Human Nutrition, and Integration of Systems.

**2.** In the generic category of "Systems," ARS is currently conducting research in the areas of feed handling, labor efficiency, shelter, stress, handling and transport, and manure waste. Joint Appendix (J.A.) at PP–3.

**3.** ARS, for example, is currently working with the Department of Health and Human Services

on investigating the suspected role of African Swine Fever in Acquired Immune Deficiency Syndrome. Similarly, ARS provided research and technological services in an effort to combat the avian influenza outbreak in poultry.

**4.** Appellants are the Foundation on Economic Trends, the Humane Society of the United States, the American Minor Breeds Conservancy, Jeremy Rifkin, Michael W. Fox, Lester Y. Ichinose, Ridgeway F. Shinn, III, and Patricia Frisella.

By virtue of the gradual refinement of their claims, it is now apparent that appellants object neither to selective breeding technologies *per se*, nor to specific, path-breaking research projects, such as implantation of growth hormone genes in animals or the use of recombinant DNA techniques to study growth and reproduction. Instead, appellants argue that USDA's decision to focus its animal productivity research on developing faster growing, more productive, and larger animals requires an analysis of the resulting environmental impacts.[5] They contend that an EIS is necessary to "evaluate the statutory goals—national priorities and policies—that should have been considered in the development of the USDA research program." J.A. at E–15.

### 3

NEPA's requirements are well known and thus little needs be said to describe the general compass of the Act. *See, e.g., Andrus v. Sierra Club*, 442 U.S. 347, 99 S.Ct. 2335, 60 L.Ed.2d 943 (1979); *Kleppe v. Sierra Club*, 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976); *Calvert Cliffs' Coordinating Committee, Inc. v. AEC*, 449 F.2d 1109 (D.C.Cir.1971); *Scientists Institute for Public Information v. AEC*, 481 F.2d 1079 (D.C.Cir.1973). In brief, NEPA requires federal agencies to prepare an EIS on "proposals for ... major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

The Council on Environmental Quality (CEQ) has developed guidelines for determining whether concerted agency activities qualify as a "major Federal action" requiring a single, comprehensive impact statement, known in NEPA terminology as a programmatic EIS.[6] Under the guidelines, the "[a]doption of programs, such as a group of concerted actions to implement a specific policy" constitutes "Federal action," as does "systematic and connected agency decisions allocating agency resources to implement a specific statutory program." 40 C.F.R. § 1508.18(b)(3) (1986). The guidelines also address when an agency must prepare a programmatic EIS, analyzing the cumulative impact of agency activities. A programmatic EIS is necessary, the guidelines state, where the proposals for federal action "are related to each other closely enough to be, in effect, a single course of action." *Id.* § 1502.4(a). Later passages in the guidelines, defining the scope of an EIS, shed further light on the idea of a close relation. "Connected actions" are "closely related," and thus to be treated in one statement, "if they: (i) Automatically trigger other actions which may require environmental impact statements. (ii) Cannot or will not proceed unless other actions are taken previously or simultaneously. (iii) Are interdependent parts of a larger action and depend on the larger action for their justification." *Id.* § 1508.25(a)(1).

Appellants' theory under NEPA is one of aggregation. Renouncing any interest in challenging a particular aspect of research, appellants instead maintain that ARS's animal productivity research program *as a whole* requires a programmatic EIS. USDA argues, however, that its animal productivity research consists of projects too diverse and discrete to constitute either a "major Federal action" or activities sufficiently "systematic and connected" to require a programmatic EIS. We agree. As we noted previously, USDA's animal productivity research spans a variety of distinct subject areas ranging from the study of the reproductive processes to the control of insects. *See supra* text at note 2. As we likewise sought to adumbrate, research efforts take many different directions within each of the six

---

5. *See infra* n. 8.

6. CEQ was created by NEPA to review the federal government's various programs and activities in light of the Act's policies. In 1977, President Carter ordered CEQ to issue a set of uniform, mandatory regulations binding upon federal agencies in the implementation of NEPA's procedural provisions. Exec.Order No. 11991, 3 C.F.R. § 124 (1978). CEQ's interpretation of NEPA enjoys substantial deference in the courts. *See Andrus*, 442 U.S. at 357–58, 99 S.Ct. at 2341 (1979).

broad categories. *See supra* text at 882–883.

Not only are the research projects diverse, they are discrete and independent in nature. They are separately operated. Approval of one project does not insure approval of technologically similar projects. Success in one project area does not invariably affect the variety or direction of USDA research, inasmuch as USDA's research program is largely reactive, designed as we indicated before to respond to the needs of USDA, other regulatory agencies, user groups, and consumers.

■ Appellants nonetheless contend that USDA's animal productivity research constitutes a "major Federal action" under NEPA because the research is directed toward a single policy objective, namely productive efficiency. In support of their position, appellants point to the CEQ definition, which as we saw above includes implementation of a specific policy or specific statutory program. 40 C.F.R. § 1508.18(b)(3). It is clear, and indeed uncontested, that a specific "policy" underlies USDA research. The CEQ guidelines, however, require more: the agency's actions or decisions must be "concerted" or "systematic and connected." Appellants have in no way elucidated, and we fail to discern, how USDA's vast array of animal productivity research projects are interrelated or interdependent, other than sharing a common goal. But mere commonality of objective is insufficient under the guidelines to con-

stitute a "major Federal action," which is a *sine qua non* of NEPA's applicability (in addition to the requirement of "significantly affecting" the environment).[7]

It is of course true that the USDA research projects all pertain to animals and are ultimately directed toward achieving greater productivity; but these rudimentary similarities do not suffice to bind into a "program," *id.* § 1508.18(b)(3), the universe of animal productivity research conducted by USDA. In CEQ terms, the projects are not "related to each other closely enough to be, in effect, a single course of action" so as to require a programmatic EIS. *Id.* § 1502.4(a). *See Kleppe*, 427 U.S. at 408–15, 96 S.Ct. at 2729–33 (1976) (programmatic EIS required only where sufficiently "related" actions will have "cumulative or synergistic" environmental impact). Just as it seems doubtful that Congress expected an EIS to accompany "research into ... the basic problems of agriculture" (the agency's basic mandate), it seems doubtful that it expected an EIS with regard to "increasing animal productivity" (the goal alleged by appellants). Appellants' Brief at 16–17.

4

The defect in appellants' challenge thus lies in its generality. As we noted previously, appellants do not object to particular research projects, but instead aim their fire at the lack of diversity in USDA's research goals.[8] EIS responsibilities, however, are

---

7. Appellants charge that USDA has artificially compartmentalized its research in order to avoid doing a programmatic EIS. Although an agency cannot escape NEPA's requirements by deliberately splintering its agenda for evasive purposes, *see National Wildlife Federation v. Appalachian Regional Comm'n*, 677 F.2d 883, 890 (D.C.Cir.1981), USDA's research categories seem to the untrained eye rather natural in light of the breadth of research that it conducts. There certainly appears to be no NEPA-interdicted skulduggery afoot.

8. In some passages of their argument, appellants express concern over the effects of "highly capital-intensive, concentrated confinement animal husbandry and production practices." Brief for Appellants at 22. Appellants allege that such production methods may result in increases in animal disease, pollution from animal wastes, and dangers from the use of antibi-

otics, among other hazards. *Id.* at 22–23. We may assume, without deciding, that if indeed the agency organized research around such a theme, its research activities could be characterized as sufficiently "systematic and connected" to require a programmatic EIS. But the record before us fails to support such an inference. None of the samples of research into genetics and breeding referred to at the outset of our opinion, for example, fits comfortably within the narrow framework discerned by appellants. Furthermore, appellants themselves cite among other authority an article by a USDA researcher, H.S. Siegel, entitled "Effects of Intensive Production Methods on Livestock Health," J.A. at M, which discusses the relationship of infectious diseases and intensive production. Appellants' Brief at 23. Such research hardly accords with appellants' concern that the USDA's animal productivity research is systematically neglecting the effects of intensive production.

triggered only by *proposals* for action. *Kleppe,* 427 U.S. at 404–06, 96 S.Ct. at 2727–28 ("contemplated" actions are not within NEPA's scope). As the District Court correctly observed, the objectives of scientific research are not "proposals" for action. The same sorts of practical impediments discerned by the Court in *Kleppe, id.* at 401–02, 96 S.Ct. at 2726, to preparation of a programmatic EIS exist in this setting as well. It is a concrete *action,* which will spawn "expected adverse environmental consequences," *id.* at 401, 96 S.Ct. at 2726, that triggers NEPA's requirement. As far as this record reveals, there is no plan (or, more precisely, "proposal") for action here in the far-flung reaches of animal productivity research.

NEPA, in sum, is not a suitable vehicle for appellants' express purpose: to have USDA reevaluate, and as a result diversify, its current research focus. NEPA was not intended to resolve fundamental policy disputes. As the Supreme Court recently admonished, "[t]he political process, and not NEPA, provides the appropriate forum in which to air policy disagreements." *Metropolitan Edison Co. v. People Against Nuclear Energy,* 460 U.S. 766, 777, 103 S.Ct. 1556, 1563, 75 L.Ed.2d 534 (1983) (citation omitted). A policy disagreement, at bottom, is the gravamen of appellants' complaint.[9] In our view, "[t]ime and resources are simply too limited for us to believe that Congress intended to extend NEPA as far as [appellant would take] it." *Id.* at 776, 103 S.Ct. at 1562.

*Affirmed.*

---

9. Because we hold that USDA's animal productivity research is not a "proposal" or a "major Federal action," we need not reach the further question, resolved negatively by the District Court, whether USDA's research activities "significantly affect[ ] the quality of the human environment."