**NATIONAL RESOURCES DEFENSE COUNCIL, INC., et al., Plaintiff,**

v.

**Federico PEÑA, Secretary of Energy, et al., Defendant.**

**Civ. A. No. 97–00936.**

United States District Court, District of Columbia.

Aug. 8, 1997.

---

Lisa G. Dowden, Robert L. Roach, Spiegel & McDiarmid, Barbara A. Finamore, Natural Resources Defense Council, Washington, DC, for Plaintiffs.

Martin James LaLonde and Anthony P. Hoang, U.S. Department of Justice, Environmental & Natural Resources Division, Washington, DC, for Federal Defendants.

## MEMORANDUM OPINION

SPORKIN, District Judge.

This matter is before the Court on Plaintiffs' Motion for a Preliminary Injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure (the "FRCP"). Plaintiffs seek to enjoin the Honorable Federico Peña, Secretary of the Department of Energy ("DOE"), and all those in active concert or participation with him, from the expenditure of any funds and any other action in furtherance of the construction or major upgrades in mission capability of the facilities and activities in thirteen on-going and proposed projects at various installations across the country, pending the Court's ruling on the merits of Plaintiffs' claim. The projects are part of the DOE's proposed Stockpile Stewardship and Management Program (the "SSM Program"), as outlined in a May 1995 document entitled *The Stockpile Stewardship and Management Program.* Plaintiffs allege that the DOE failed to perform an adequate programmatic environmental review of the proposed SSM Program (the "SSM PEIS"), as required by the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, *et seq.* and the regulations promulgated thereunder by the Council on Environmental Quality (the "CEQ").

The Court has considered the motion and the opposition thereto, and heard argument on June 17 and 24, 1997.

## BACKGROUND

### A. Changes in the Security Environment

Since the United States first obtained nuclear weapons in the 1940's, the DOE and its predecessor agencies have been charged with the responsibility for providing the United States with such weapons and with ensuring that our nuclear weapons remain safe and reliable. DOE has traditionally assured the safety and reliability of our nuclear weapons in three ways: (1) by modernizing the arsenal, producing newly-designed weapons; (2) by conducting a formal surveillance program, known as the Stockpile Evaluation Program, to uncover safety and reliability problems with weapon components and subsystems; and (3) by conducting underground nuclear testing in conjunction with a vigorous research and development program.

The substantial changes in U.S. national security policy since the end of the Cold War have substantially affected the traditional reliance on new-design weapon production and nuclear testing. The United States has entered into two strategic arms reduction treaties ("START") and has stopped developing and producing new-design nuclear weapons, resulting in a smaller and older inventory of such weapons. The government has also observed a moratorium on underground nuclear testing since 1992 and, since August 1995, has pursued a "zero-yield" Comprehensive Test Ban Treaty, which would ban nuclear weapons test explosions.[1] The President and Congress directed the DOE to develop a program for maintaining the United States' intellectual and technical competencies in nuclear weapons and for ensuring national confidence in the safety and reliability of the nuclear stockpile in this new security environment, wherein the DOE's traditional approach to ensuring the safety and reliability of the United States' nuclear weapons had

1. The United States and more than 140 other countries signed the Comprehensive Test Ban Treaty in September 1996, and the treaty is currently awaiting ratification by the United States Senate. Declaration of John D. Holum, Director, United States Arms Control and Disarmament Agency (Defendants' Exhibit 16), ¶ 4.

changed dramatically.[2] DOE claims that it developed the SSM Program in response to the mandate established by the President and the Congress.

## B. The SSM Program and Development of the SSM PEIS

DOE outlined the scope of its proposed SSM Program in a May 1995 document entitled *The Stockpile Stewardship and Management Program* (the "SSM Program Plan").[3] The SSM Program Plan consists of five strategies: (1) enhanced experimental and computational capabilities;[4] (2) enhanced weapons and materials surveillance technologies;[5] (3)

effective and efficient production complex; (4) long-range stockpile support; and (5) tritium production.[6] DOE stated that it has committed to preparing a PEIS for the SSM Program, and has provided information about its proposed schedule for the PEIS.[7]

The DOE held a conference to discuss the framework and scope of the SSM PEIS with interested members of the public on May 19, 1995, and issued a Notice of Intent to prepare a PEIS for the SSM Program on June 14, 1995. In its Notice of Intent, the agency stated that the primary goal of stockpile management was the downsizing and consoli-

**2.** *See, inter alia,* National Defense Authorization Act for Fiscal Year 1994, Pub.L. No. 103–160, § 3138 (November 30, 1993); S.Rep. No. 103–282, 103rd Cong., 2d. Sess. 509–10 (1994); Pub.L. No. 103–337, § 3131, 103rd Cong., 2nd Sess (October 5, 1994); Conf. Rep. No. 103–701, 103rd Cong., 2d Sess. 1593 (1994); A.R. Doc. 1–1561; A.R. Doc. I–977.

**3.** In the SSM Program Plan, the DOE describes the SSM Program as consisting of two components: stockpile stewardship and stockpile management. Stockpile stewardship comprises "the activities associated with research, design, development and testing of nuclear weapons and the assessment of their safety and reliability." Stockpile management includes "operations associated with producing, maintaining, refurbishing, surveilling and dismantling the nuclear weapons stockpile at the DOE nuclear weapons industrial facilities." A.R. Doc I–1561.

**4.** To implement the Enhanced Experimental and Computational Capabilities strategy, the SSM Program Plan proposes to develop and modernize a number of facilities, including the Contained Firing Facility ("CFF"), the Dual–Axis Radiographic Hydrodynamic Test ("DAHRT") Facility, the Advanced Hydrotest ("AHT") Facility, the National Ignition Facility ("NIF"), the Atlas Facility, the Jupiter Facility (later dropped in favor of the X–1 Advanced Radiation Source) and the High Explosive Pulse Power Facility ("HEPPF"). The three most significant of those facilities for the immediate matter before this Court are the NIF, the CFF and the Atlas Facility. The NIF is a large laser facility discussed in detail below. The CFF is a fully enclosed firing chamber for high explosive driven experiments involving the primary (fission trigger) stage of a two-stage nuclear weapon. The Atlas Facility is a large capacitator bank for electrical pulse power driven weapons physics experiments. The NIF, the CFF and the Advanced Hydrotest Facility are scheduled to be built at Lawrence Livermore National Laboratory in California ("LLNL"), the Atlas Facility is scheduled to be built at the Los Alamos National Laboratory in

New Mexico ("LANL"), and the X–1 Advanced Radiation Source is scheduled to be built at the Sandia National Laboratory in New Mexico.

**5.** To implement the Enhanced Weapons and Materials Surveillance Technology strategy, the SSM Program Plan calls for upgrades to the Chemical and Metallurgy Research Laboratory at LANL (the "CMR Building") and use of the Los Alamos Neutron Science Center ("LANSCE"). It also contemplates hydro nuclear experiments, limited to "subcritical" underground tests.

**6.** The DOE has already prepared a separate EIS with respect to tritium production, so this strategy will not be considered for the purpose of analyzing the adequacy of the SSM PEIS.

**7.** Several environmental groups filed suit in this Court on June 27, 1989 in an attempt to force the DOE to prepare a PEIS for its proposed production and weapons clean-up initiative. *NRDC v. Watson,* No. 89–1835. Subsequently the parties negotiated a joint stipulation in which DOE agreed, *inter alia,* that it would publish two notices of intent in the Federal Register: one notice for the preparation of a PEIS for the five-year environmental restoration and waste management plan, and the other notice for the preparation of a PEIS on the reconfiguration of the nuclear weapons production complex (the "Reconfiguration PEIS"). The Court entered the joint stipulation and dismissed the lawsuit on October 22, 1990 and the DOE published each of the agreed-upon notices of intent, the latter on February 11, 1991. 56 Fed.Reg. 5590, A.R. Doc. I–23. Significant changes in U.S. national security policy occurred over the course of the DOE's preparation of the Reconfiguration PEIS, and the agency decided to abandon the Reconfiguration PEIS as it had been planned. 59 Fed.Reg. 54175 (Oct. 28, 1994). Instead, the DOE decided to prepare a PEIS for the SSM Program and was directed by Congress to prepare a PEIS for Tritium Supply and Recycling. Pub.L. No. 103–160, § 3145.

dation of functions "to provide an effective and efficient production capability for the smaller stockpile." 60 Fed.Reg. at 31293. As for stockpile stewardship, the DOE described the goal as evaluating the enhanced experimental and computation capabilities that will be needed to assess and predict the consequences of problems related to the aging nuclear stockpile.

DOE conducted public meetings with respect to the SSM PEIS between June 1995 and August 1995. During this process, the agency received more than 13,000 public comments. A.R. Doc. I–I 336, Implementation Plan, at 4–1 to 4–2. The DOE then prepared the Implementation Plan for the SSM PEIS, in which it described the evolution of the NEPA process for the nuclear weapons complex; the purpose and need for the PEIS; and the scope of the PEIS. In February 1996, the DOE released the three-volume SSM Draft PEIS [8] and published a notice of its availability for public review and comment. The public comment period ran from March 8, 1996 to May 7, 1996.

### C. Elements of the SSM Draft PEIS

The SSM Draft PEIS was based on the SSM Program Plan, supplemented by subsequent budget requests to Congress. In the document, the agency stated that the purposes of the SSM Program were to maintain the safety and reliability of the U.S. nuclear weapons stockpile and to maintain the core U.S. intellectual and technical competencies in nuclear weapons. On stockpile stewardship, the DOE considered one programmatic No Action alternative and five programmatic action alternatives: (1) science-based stockpile stewardship and management (providing enhanced experimental capabilities)(the "Preferred Programmatic" alternative); (2) locating stewardship functions at manufacturing facilities; (3) dismantling the nuclear weapons complex; (4) utilizing a two-laboratory system; and (5) using a non-science based stockpile stewardship approach (e.g.

denuclearization, nuclear testing, and remanufacturing). The agency claimed that it eliminated all but the science-based stockpile stewardship approach from detailed study because the alternative approaches would not fulfill the purpose and need of the SSM Program. See A.R. Doc. I–1385, SSM DPEIS, Vol I, at 3–5 to 3–8. As to stockpile management, the DOE evaluated the no action alternative (the "Programmatic No Action" alternative) and the sites that the agency deemed reasonable for each of the stockpile management functions.

In essence, the SSM Draft PEIS evaluated two alternatives for the SSM Program in detail: the Programmatic No Action alternative, and the Preferred Programmatic alternative.

#### 1. *Programmatic No Action alternative*

Under the Programmatic No Action alternative, the DOE would fulfill its on-going responsibility to support the Nation's nuclear weapons stockpile and to maintain the safety and reliability of the nuclear weapons stockpile by continuing the activities currently associated with stockpile stewardship and management using existing facilities, including continuation of the research and development aspects of the SSM Program. On the stockpile stewardship program, this alternative calls for the DOE to continue using existing experimental facilities at the weapons laboratories. As to stockpile management, this alternative calls for the agency to retain its functions at their current locations. The agency would not consolidate the industrial base of the nuclear weapons complex or re-establish its desired plutonium pit fabrication capability under this alternative.

#### 2. *Preferred Programmatic alternative*

The Preferred Programmatic alternative evaluated the likely programmatic impacts of what is now the proposed SSM Program. The DOE performed its analysis in a main

---

8. Volume I of the draft PEIS contains the analyses, findings, and conclusions regarding the environmental impacts of the proposed SSM Program, including those relating to the alternatives, the affected environment, and occupational health and safety. Volume II contains technical

appendices for the analyses in Volume I and provides additional project information. Volume III contains environmental analyses, findings, and conclusions specific to the proposed NIF, CFF, and Atlas Facility.

volume and various appendices to the SSM PEIS.[9]

This alternative consisted of three elements: (1) enhanced experimental capability; (2) adjustment (called "right sizing") of the industrial base; and (3) re-establishment of the manufacturing capability and capacity for pit components. On stockpile stewardship, the Preferred Programmatic alternative would establish experimental alternatives to nuclear testing as a means to ensure the reliability of the nuclear stockpile. This alternative calls for the DOE to enhance its scientific capabilities by constructing and operating three new major facilities: CFF at the Lawrence Livermore National Laboratory in California ("LLNL") for experiments involving the physics of nuclear weapons primaries; NIF at LLNL for experiments involving the physics of nuclear weapons primaries and secondaries; and the Atlas Facility at Los Alamos National Laboratory in New Mexico ("LANL") for experiments involving the physics of nuclear weapons primaries and secondaries.[10]

On stockpile management under this alternative, the DOE proposed to: (1) down-size its Pantex Plant, which supports weapons assembly and disassembly; (2) locate non-nuclear component fabrication at a down-sized Kansas City Plant; (3) down-size the Oak River Reservation to support secondary and case component fabrication; and (4) re-establish capability and small capacity for pit component fabrication at LANL.

9. Appendix I to the SSM PEIS described the purpose and need of the NIF and examined alternate sites for the facility, and also analyzed the No Action alternative, the project design options, the affected environment, the environmental consequences of constructing and operating the facility at each of the different sites, and mitigation measures. Appendix J evaluated the environmental consequences of constructing CFF at LLNL and not constructing CFF at all. Appendix K considered the environmental consequences of constructing the Atlas facility at LANL, and not constructing the Atlas facility at all, after concluding that the other alternatives would not meet the purpose and need for DOE action.

10. A nuclear weapon consists of two assemblies: the primary, which provides an initial source of

## D. Developing the SSM PEIS from the SSM Draft PEIS

Between March and May 1996, the DOE conducted public hearings on the SSM Draft PEIS. Over 1400 people attended those hearings, and the DOE received almost 8000 comments on the SSM Draft PEIS. DOE released the four-volume Final PEIS on November 8, 1996 and published a notice of its availability in the Federal Register. 61 Fed. Reg. 58548 (November 15, 1996). The SSM PEIS made only minor changes to the SSM Draft PEIS.[11] The Secretary of Energy signed the Record of Decision for the SSM Program on December 19, 1996.

## E. Procedural History and Substance of the Immediate Matter

Plaintiffs filed their motion for a preliminary injunction in this case on May 2, 1997, seeking to enjoin new SSM facilities, as well as activities or major upgrades to mission capability. They claimed that Defendant failed to perform an adequate programmatic environmental review of the SSM Program as required by NEPA by: (1) failing to address DOE's entire proposed SSM Program Plan in the SSM PEIS and by (2) failing to rigorously explore and objectively evaluate reasonable alternatives to its proposed SSM Program Plan. Plaintiffs also claimed that the government failed to adequately disclose and analyze the environmental impacts of the proposed SSM Program.

At the hearing on June 24, 1997, Plaintiffs advised the Court that they had limited their

energy, and the secondary, which provides energy release. The primary contains a central core, called the "pit," which is composed of plutonium or highly enriched uranium and surrounded by high explosives. The secondary is composed of lithium deuteride and other materials. Administrative Record ("AR") document I–1561; SSM Program Final Environmental Impact Statement ("SSM FPEIS"), Vol. I at 2–5.

11. The Final PEIS, or the SSM PEIS, only modified the SSM Draft PEIS is a few respects. The SSM PEIS did identify the Pantex Plant as the preferred location for high explosive fabrication and modified the No Action alternative to expand the discussion of its environmental impacts and provide a more detailed explanation as to why the DOE had eliminated all but two alternatives from detailed study in the Final PEIS.

motion for preliminary injunction. In their limited motion, Plaintiffs asked that the government be enjoined from taking any actions in furtherance of the designs and/or construction of the NIF and be enjoined from taking any actions in furtherance of major upgrades in mission capability at the CMR Building and the Nuclear Materials Storage Facility, both at LANL.

## ANALYSIS

Four factors must be considered in deciding whether to issue a preliminary injunction: (1) the likelihood of success on the merits; (2) irreparable harm to the plaintiff; (3) whether the issuance of a stay would substantially harm other interested parties; and (4) a determination of where the public interest lies. *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C.Cir.1977).

In evaluating the likelihood of Plaintiffs' success on the merits, the Court must look to apply the "arbitrary and capricious" standard of the Administrative Procedure Act (the "APA"), 5 U.S.C. § 706(2)(A),(C). The APA provides that an agency action may be overturned only if it is

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law; [or]

(C) in excess of statutory jurisdiction, or limitations, or short of statutory right;

*See, Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989); *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Louisiana Ass'n of Independent Producers v. FERC,* 958 F.2d 1101, 1117 (D.C.Cir.1992); *National Trust for Historic Preservation v. Dole,* 828 F.2d 776, 781 (D.C.Cir.1987).

In APA cases, it is settled law that "the ultimate standard of review is a narrow one: the court is not empowered to substitute its judgment for the agency's." *Overton Park,* 401 U.S. at 416, 91 S.Ct. at 824; *see, also, Citizens Against Burlington, Inc. v. Busey,*

938 F.2d 190, 194 (D.C.Cir.1991). Where an agency's particular technical expertise is involved, a reviewing court should be especially careful in guarding the agency's discretion. *Marsh,* 490 U.S. at 376–77, 109 S.Ct. at 1860–61; *Baltimore Gas & Electric Co. v. NRDC,* 462 U.S. 87, 103, 103 S.Ct. 2246, 2255, 76 L.Ed.2d 437 (1983) ("[A] reviewing court must remember that the Commission is making predictions, within its area of special expertise, at the frontiers of science. When examining this kind of scientific determination, as opposed to simple findings of fact, a reviewing court must be at its most deferential.").[12]

While Plaintiffs argue that the SSM PEIS was "arbitrary and capricious" in at least three respects, the Court cannot now make any such finding. The Plaintiffs do not now appear likely to succeed on the merits of their case. What is more, the national security interests associated with implementing the SSM Program likely outweigh Plaintiffs' immediate environmental concerns, a further argument against issuing a preliminary injunction in this matter now.

## I. The Likelihood of Success on the Merits

Plaintiffs offered two arguments as to how Defendants' SSM PEIS violates NEPA and the CEQ regulations, as described above. None of the arguments is sufficiently compelling to grant Plaintiffs' motion for a preliminary injunction.

### A. Inclusion of Defendants' Entire Proposed SSM Program Plan in the SSM PEIS

Plaintiffs claim that the SSM PEIS fails to address the DOE's entire proposed SSM Program Plan, as would be necessary to provide a reasoned basis for programmatic decision-making by the DOE, Congress and the President. In particular, Plaintiffs argue that (1) the Programmatic No Action alternative prevents useful comparison because it

---

12. The Court also notes that the scope of review for APA cases is generally limited to the administrative record that was before the agency at the time the agency made its decision. *See Florida*

*Power and Light Co. v. Lorion,* 470 U.S. 729, 743, 105 S.Ct. 1598, 1606–07, 84 L.Ed.2d 643 (1985); *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973).

includes proposed SSM Program actions (rather than limiting that alternative to activities now in place); and (2) the Preferred Programmatic alternative improperly excludes analysis of future activities and facilities related to the development of new technologies.

The CEQ regulations address the proper scope of a proposal to be analyzed in an EIS Agencies, including DOE, must "make sure that the proposal which is the subject of the environmental impact statement is properly defined ... [and] uses the criteria for scope to determine which proposal[s] shall be the subject of a particular statement. Proposals or parts of proposals which are related to each other closely enough to be, in effect, a single course of action must be evaluated in a single impact statement." 40 C.F.R. § 1502.4(a). Courts have generally held that the determination of the proper scope of a PEIS is a matter that is initially committed to the agency's discretion. *Kleppe v. Sierra Club,* 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976); *National Wildlife Fed'n v. Appalachian Regl. Commn.,* 677 F.2d 883 (D.C.Cir.1981).

The Court's analysis begins with the premise that the SSM Program does not really represent a new proposal.[13] The DOE and its predecessor agencies have been conducting and engaging in stewardship and management of the nation's nuclear weapons arsenal for over fifty years. What is new is that the DOE must now conduct stockpile stewardship activities without either underground nuclear testing or the development and production of new-design weapons, and it must now conduct stockpile management activities with a smaller industrial base.

It must also be recognized that the SSM Program is not static. The stewardship program, in particular, involves continuing active research and development, which, by its nature, is continuously evolving. Political uncertainties with respect to the future of the

nuclear arsenal add another dimension of complexity.

In *Foundation on Econ. Trends v. Lyng,* 817 F.2d 882 (D.C.Cir.1987), this Circuit looked at the CEQ regulations to determine whether the proposals at issue were "related to each other closely enough to be, in effect, a single course of action." 817 F.2d at 884. The Court found that certain Department of Agriculture research projects in that case were too "diverse" and "discrete" and "independent in nature" to require a PEIS.

■ This matter is analogous to *Lyng.* The activities envisioned in the SSM Program are varied and somewhat geographically diverse. DOE intends that those activities advance a number of goals with respect to the maintenance of the nuclear stockpile in a dynamic political and technological environment. The Court cannot reasonably construe NEPA or the CEQ regulations to require that the DOE prepare a single, comprehensive PEIS or that the scope adopted by the DOE in the SSM PEIS was "arbitrary and capricious." Indeed, if the Court were to order that a PEIS be done with the comprehensiveness that Plaintiffs request, it is very doubtful that any such document could be completed quickly and thoroughly enough to aid decision makers and the public before the politics and the technology changed. The only effect would be to strangle the SSM Program in its cradle.

The scope of the SSM PEIS is already quite extensive. The DOE addressed the significant aspects of "enhanced experimental capability" in evaluating the NIF, CFF and Atlas facilities as part of the proposed action and evaluated the next generation facilities to the extent that the impacts are foreseeable. The DOE also addressed the significant aspects of "effective and efficient production complex" in the evaluation of right sizing the industrial base. The agency explained that the remaining elements of the four strategies addressed in the SSM PEIS involved the

13. Defendants argue that the publication *SSM Program: Maintaining Confidence* is not a "Program Plan" for the SSM Program requiring a PEIS encompassing its entire scope. For the reasons stated below, the Court finds that, while the published document does conceptually establish the scope of the SSM Program, the DOE need not be required to perform a PEIS with a scope that parallels that of the publication.

"redirection of R & D efforts at the weapons laboratories away from the design of new weapons toward the development of appropriate technologies to address the needs of a safe, reliable, and smaller, aging stockpile." SSM PEIS, Vol. I, at 1–8. DOE maintains that such redirection would not involve significant new environmental impacts, apart from those occurring at existing facilities and analyzed as part of the Programmatic No Action alternative.

The dynamism and potential mutability of the SSM Program—conceded by Defendants—does indicate that the program must be made subject to a watchful eye. The Court gives great weight to Plaintiffs' environmental concerns. At the hearing on June 24, 1997, the government advised this Court that the DOE makes environmental site reports each year, and will re-evaluate this program every five years. The Court assumes that the non-classified portions of each such site report shall be made available to Plaintiffs and is confident that such a procedure will enable the well-regarded environmental groups that have brought this action to maintain a watchful eye on the implementation of the SSM Program.

B. *Consideration of "Reasonable" Alternatives to the SSM Program Plan*

Plaintiffs also claim that the SSM PEIS violated NEPA and CEQ regulations because it failed to rigorously and objectively evaluate reasonable alternatives to the SSM Pro-gram Plan or reasonable alternatives to meeting the purpose and need for the three "Enhanced Experimental Capabilities" (NIF, CFF and Atlas) proposed for construction in the SSM PEIS.[14] With respect to the SSM Program Plan, Plaintiffs argue that the DOE should have made a detailed analysis of at least seven alternatives proposed by commenters during the PEIS process.[15] At the hearing on June 24, 1997, Plaintiffs' counsel pressed for full consideration of the Consolidation[16] and the Remanufacturing Options,[17] at the very least. Plaintiffs object to "DOE's arbitrary construct that presents decision makers with an artificial choice between DOE's preferred configuration of facilities and no action." Plts. Memorandum of Points and Authorities in Support of Plts' Motion for a PI, p. 30.

NEPA requires a federal agency to "study, develop and describe appropriate alternatives" to a proposed action. 42 U.S.C. § 4332(C), (E). The CEQ regulations implementing the NEPA explain that the agency is obligated to "[r]igorously explore and objectively evaluate all **reasonable** alternatives" (emphasis added). 40 C.F.R. § 1502.14(a). A "proposed alternative is reasonable only if it will bring about the ends of the federal action" measured by whether it achieves the goals the agency sets out to achieve. *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 195 (D.C.Cir.), *cert. denied*, 502 U.S. 994, 112 S.Ct. 616, 116 L.Ed.2d 638 (1991), citing *City of Angoon v.*

---

**14.** Plaintiffs concede that the government did fully analyze alternative sites for the NIF.

**15.** Those alternatives were: (1) program-wide consolidation of stewardship and management capabilities and elimination of allegedly redundant capabilities (the "Consolidation Option"); (2) alternatives to NIF, CFF and the Atlas Facility; (3) emphasis on safety and reliability issues affecting enduring stockpile weapons primaries; (4) emphasis on remanufacturing for both stockpile stewardship and management (the "Remanufacturing Option"); (5) consideration of whether the SSM Program objectives require more pit production capability than is currently available at LANL; (6) reduction or elimination of nuclear-weapons-related test activities at the Nevada Test Site; and (7) examination of the effects on the DOE of (i) large scale de-alerting and negotiated deep reductions of U.S. and Russian nuclear arsenals to the approximate levels now possessed

by the other three declared nuclear weapons powers or (ii) commitment to total elimination pursuant to the Nuclear Nonproliferation Treaty with interim "curatorship" of a declining nuclear weapons stockpile.

**16.** The Consolidation Option calls for the examination of the consolidation of plutonium and uranium handling activities within the management and stockpile stewardship programs, as well as the consolidation of redundant functions within and between sites.

**17.** The Remanufacturing Option calls for the examination of whether weapons designs slated for retention in the stockpile could be retained longer by replacing components of any or all such weapons rather than the entire weapon. Plaintiffs claim that adoption of this option might obviate the need to build the NIF.

*Hodel,* 803 F.2d 1016, 1021–22 (9th Cir.1986) ("When the purpose is to accomplish one thing, it makes no sense to consider the alternative ways by which another thing might be achieved.").

This Circuit has held that an agency's evaluation of its objectives is heavily influenced by the agency's consideration of "the views of Congress, expressed, to the extent that the agency can determine them, in the agency's statutory authorization to act, as well as in other congressional directives." *Citizens Against Burlington, Inc.,* 938 F.2d at 196 (citing *City of New York v. Department of Transportation,* 715 F.2d 732, 743–45 (2d Cir.1983). "[W]hen Congress has enacted legislation approving a specific project, the implementing agency's obligations to discuss alternatives in its [EIS] is relatively narrow." *Izaak Walton League of America v. Marsh,* 655 F.2d 346, 372 (D.C.Cir.1981).

The DOE argues that only the Preferred Programmatic alternative was consistent with "its historical mission and . . . Congressional and Presidential mandates." Defendants' Memorandum of Points and Authorities in Opposition to Plts. Motion for PI," p. 63. Defendants pointed out that the CEQ regulations implementing NEPA only require an agency to "briefly discuss" the reasons for eliminating potential alternatives "from detailed study." 40 C.F.R. § 1502.14(a).

The Court will not order that the DOE do full analyses of additional programmatic alternatives to the SSM Program. The DOE is entitled to some deference with re-spect to its internal decisions on which alternatives to the SSM Program were "reasonable" and required full analysis in the PEIS. What is more, the direction of the SSM Program is consistent with Presidential and Congressional mandates.[18]

But more disclosure is in order, especially when such disclosure might be provided while the SSM Program progresses. Plaintiffs claim that, by not addressing additional alternatives to the SSM Program, the government has not fully ensured that its decision to adopt the SSM Program was appropriate. The Court notes that the government agreed at the hearing on June 24, 1997 to address Plaintiffs' specific questions with respect to the Consolidation and the Remanufacturing Options, and the Court expects that the government will respond to Plaintiffs' reasonable requests for more information on those programs within sixty days of the provision of written questions to the DOE by Plaintiffs.

## II. Failure to Grant an Injunction Will Not Result in Irreparable Harm to the Environment

Plaintiffs argue that the government's failure to disclose and analyze the environmental impacts of various aspects of the SSM Program will result in irreparable harm to the environment. At the hearings on June 17 and 24, 1997, Plaintiffs made clear to the Court that their greatest concerns were: (1) DOE's proposal to transfer plutonium pit fabrication from the now defunctioning Rocky Flats Weapons Plant to the LANL; and (2) the construction of the NIF.[19]

**18.** Congress enacted legislation specifically approving "a stewardship program [that] shall include . . . advanced computation capabilities [and] new facilities . . . such as an advanced hydrodynamic facility, the National Ignition Facility, and other facilities for above-ground experiments to assess nuclear weapons effects." National Defense Authorization Act for Fiscal Year 1994, Pub.L. No. 103–160, § 3138. The President issued mandates to DOE through the classified Presidential Decisions Directives and in public statements. A.R. Doc. I–1561; SSM FPEIS, Vol. I, at 2–3. At the hearing on June 24, 1997, Plaintiffs argued that language in a report issued recently by the Committee on National Security in the House of Representatives was indicative of failing support for the NIF and the Chemical and Metallurgy Research Laboratory at LANL (or CMR Building). Analysis of the report revealed that the Committee's concern related to the timing of spending decisions rather than the programs *per se.* H.R.Rep. No. 105–132, at 488, 491–92 (1997). If Congress lost confidence in the programs, the Court is confident that the legislature would know how to make its displeasure known.

**19.** Plaintiffs also argue that the SSM PEIS and the supplemental EIS appendices for individual facilities do not demonstrate that current DOE facilities for the treatment, storage and disposal of waste are adequate to handle the cumulative waste streams that will be generated by all the SSM proposed facilities. The DOE has agreed to address those issues in a Waste Management PEIS and, perhaps, other, site-wide EIS's.

Nuclear weapons pit production involves the processing of substantial quantities of plutonium, a highly toxic nuclear explosive material. The environmental contamination caused by pit production at the Rocky Flats plant was severe enough to necessitate closing that plant in 1989. The proposal to transfer the Rocky Flats production capability to the LANL will increase both the number and types of pits LANL produces,[20] and the amount of radioactive and hazardous substances it handles. Plaintiffs express special concern that the SSM PEIS failed to adequately assess the possibility of fires or explosions, each of which could lead to the destructive release of plutonium isotopes to the surrounding environment at the proposed upgraded LANL pit production facility.

Plaintiffs describe the National Ignition Facility, or NIF, as "the world's biggest laser" and "a high energy laser the size of the Rose Bowl intended to achieve the ignition of micro-fusion reaction in the laboratory." See Plts. Memo of Points and Authorities in Support of Plts. Motion for a PI, p. 9. The DOE's stated purpose for the construction of the NIF is to improve the agency's understanding of the physics of nuclear weapons secondaries by conducting high energy density weapons physics experiments and by demonstrating inertial fusion in the laboratory. In effect, the NIF would be one of a series of facilities that would provide the DOE with enhanced experimental capabilities for primary and secondary weapons physics.[21] Plaintiffs question whether the

NIF is feasible or necessary, and express the concern that its construction might increase the risk of worldwide nuclear proliferation.[22]

■ Plaintiffs' motion for a preliminary injunction against the plutonium pit fabrication program at LANL and the NIF must fail at this time. The DOE has looked carefully at each of these programs, and the Congress has done so as well.

The Court is not entirely satisfied with the disclosure that surrounds these programs. The Court will request that the DOE perform a fuller disclosure of the environmental, health and safety risks associated with the plutonium pit fabrication program at LANL and the NIF within a reasonable time after the issuance of this Memorandum Opinion. Such disclosure should be responsive to Plaintiffs' concerns, but need not hold up the implementation of either program.

### III. The Public Interest—National Security vs. Environmental Protection

■ Plaintiffs argue that granting the preliminary injunction in this case would be in the public interest since no imminent danger to national security exists and the potential harms from the NEPA violations are serious. The essence of Plaintiffs' argument is that the SSM Program is a long-term project that can be safely deferred while the environmental concerns are addressed immediately. Plaintiffs claim that the NIF will not be available for ignition experiments until 2006 anyway.[23] Plaintiffs also claim that cost-

---

**20.** LANL already has some limited pit production capability for existing stockpile surveillance purposes, capable of producing about twenty (20) pits per year.

**21.** The composition of the "primary" and the "secondary" were described above. The primary is a nuclear fission explosion, typically based on the implosion of a pit by a big explosive. The secondary is a thermonuclear, or fusion, explosive that is compressed and ignited by the primary. "Primary physics" refers to the actions of primaries, and "secondary physics" refers to the actions of secondaries.

**22.** Plaintiffs' arguments on nuclear proliferation involve considerations that are outside the scope of the NEPA. Plaintiffs also argue that the construction of the NIF would endanger the California Tiger Salamander and have severe socioeconomic impacts on the California region. The

Court finds that Plaintiffs' arguments on this point are premature.

**23.** Defendants claim that the NIF will be partially available by 2001 and that such availability will provide DOE with essential overlap with the availability of weapons designers with nuclear test experience. DOE also claims the NIF will be fully operational in 2003. Declaration of Victor E. Reis at 4. Another senior official within DOE categorized the harm in delaying the NIF "in terms of four components: (1) financial harms; (2) scheduling impacts ... (3) the introduction of additional risks into DOE's anticipated long term capabilities to address stockpile issues; and (4) delay in DOE's fusion energy research and development program." First Declaration of David Crandall at 11.

overruns at the CMR Building will inevitably result in delays in that project as well.[24] In essence, Plaintiffs contend that any incremental risk to national security created by granting an injunction in this case would be greatly outweighed by the potential environmental gain associated with a fuller vetting of the SSM Program.

Defendants contend that any delay in the SSM Program could have serious national security implications. Secretary Peña stated that any delay in the SSM Program "may cause other countries to doubt or question the credibility of our Nation's nuclear deterrent" and, in such a situation, "rather than risk the credibility of the nuclear deterrence, there would be a significantly increased risk that the federal government would be forced to resume nuclear testing in order to ensure the safety and reliability of the stockpile." Peña Declaration, ¶ 18; see, also, Secretary of Defense William S. Cohen Declaration, ¶ 9. What is more, Defendants claim that "even a modest delay in implementing the SSM Program could have a serious impact in the short term." They contend that "an injunction would soon begin to harm the weapons' laboratories ability to certify stockpile safety and reliability." Declaration of C. Bruce Tarter, Director, LLNL.

Courts have accorded great weight to considerations of national security when balancing the interests and equities of the parties. See, e.g., *Committee for Nuclear Responsibility v. Seaborg*, 463 F.2d 796, 798 (D.C.Cir.1971)(because of "assertions of potential harm to national security and foreign policy—assertions which [the court] obviously cannot appraise—and given the meager state of the record before us, we are constrained to refuse an injunction."). In a case similar to this one, the 7th Circuit credited the potential harm to the Navy and the national defense as being one of the most important factors to be weighed. *Wisconsin v. Weinberger*, 745 F.2d 412, 427 (7th Cir.1984)("injunction's service to NEPA in preserving unbiased decision-making [on the remaining construction of a military project while the Navy completed a supplemental EIS] would be slight" and "[m]ore important

... the district court's failure to balance the weight of the alleged NEPA violation against the harm the injunction would cause the Navy and the country's defense"); *see, also, Concerned About Trident v. Rumsfeld*, 555 F.2d 817, 831 (D.C.Cir.1977).

In this case, the Court must balance two important competing interests in assessing the public interest. The national security interest here must be paramount. This Court is reluctant to override national security judgments on the viability of our nuclear program made by the Secretaries of Energy and Defense. While Plaintiffs argue that any national security vulnerability with respect to the SSM Program would be brief and would not occur until well into the future, any such vulnerability—and any future reduction in the credibility of our nuclear deterrent for even a brief period of time—would be unacceptable. This is an age when rogue nations and worldwide terrorist organizations may soon be able to gain access to nuclear weapons and attempt to use them to achieve nefarious goals. A nation with our responsibility for world leadership must be able to act quickly and effectively against all such threats. The Court cannot subjugate our nation's responsibility to provide leadership on nuclear matters on the basis of the claims made in this lawsuit. Any doubt over the credibility of our nuclear deterrent would create unacceptable risks in the event of a future crisis akin to the Cuban Missile Crisis. While the probability that such future crises might come to pass is not as great today as in the past, we must never ignore such a possibility. Although the sun shines today, dark and ominous clouds can emerge without much warning.

The Court recognizes fully that there have been enough accidents involving nuclear programs to make Plaintiffs' concerns over the environmental, health and safety issues in this case real. Indeed, recent press stories indicate that American citizens may have been exposed to excessive amounts of radiation in the nuclear tests of the 1950's. Environmentalists suggest that this could be responsible for cancers in as many as 75,000

---

24. See H.R. No. 105–132. 105th Cong., 1st Sess.    491–92 (1997).

people who were inadvertently exposed.[25] If this information is correct, the government must take all steps to prevent a recurrence of such contamination of the environment.

It is hoped that the annual provision of the site reports and the additional information to be provided to Plaintiffs will allow these and other fine groups to monitor the government's actions and ensure that any material environmental problems are addressed in a timely fashion.

## CONCLUSION

Plaintiffs' motion for preliminary injunction will be denied. The government has assured the Court that the DOE will make annual site reports with respect to each facility involved in the SSM Program and will re-evaluate the program every five years. The Court assumes that the non-classified portion of each such site report will be made available to Plaintiffs to allow them to monitor the government's actions. The Court also expects that the government will adhere to its agreement to address Plaintiffs' reasonable and specific questions with respect to the Consolidation and Remanufacturing Options within sixty days of the provision of written questions by Plaintiffs.

The Court will order that the government perform a fuller disclosure of the environmental, health and safety risks associated with the plutonium pit fabrication program at the LANL and the NIF within a reasonable period of time after the issuance of this Memorandum Opinion. Such disclosure should be responsive to Plaintiffs' concerns, but need not hold up the implementation of either program.

An appropriate order is attached hereto.

## ORDER

This matter is before the Court on Plaintiffs' Motion for a Preliminary Injunction. The Court has considered the motion and the opposition thereto and heard argument on June 17 and 24, 1997. For the reasons cited

in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that Plaintiffs' motion is denied in part and granted in part; and it is

**FURTHER ORDERED** that the government perform a fuller disclosure of the environmental, health and safety risks associated with the plutonium pit fabrication program at the Los Alamos National Laboratory in New Mexico and the National Ignition Facility at Lawrence Livermore National Laboratory in California. Such disclosure should be responsive to Plaintiffs' concerns, but need not hold up the implementation of either program. It shall be completed within sixty (60) days, or such other time as this Court may order; and it is

**FURTHER ORDERED** that the Court shall retain jurisdiction in this matter to ensure that this order is appropriately implemented.

---

**25.** *Children most vulnerable to fallout from nuclear tests,* USA TODAY, Aug. 4, 1997, at 7A, available in 1997 WL 7009781.