## NATURAL RESOURCES DEFENSE COUNCIL, et al., Plaintiffs,

### v.

## Spencer ABRAHAM, et al., Defendants.

### No. CIV.A.00–2431 EGS.

United States District Court,
District of Columbia.

Sept. 30, 2002.

Howard M. Crystal, Esquire, Eric R. Glitzenstein, Esquire, Meyer and Glitzenstein, Washington, DC, for Plaintiffs.

Marc Kesselman, Esquire, Department of Justice, Civil Division, Washington, DC, for Defendants.

*MEMORANDUM OPINION*

SULLIVAN, District Judge.

The Department of Energy ("DOE") is currently overseeing the construction of a multi-billion dollar facility in Livermore, California named the National Ignition Facility ("NIF"). The NIF, as designed, would be used to initiate and sustain the nuclear fusion process in laboratory conditions. In theory, a fusion reaction would be produced by converging 192 lasers on a tiny fuel pellet, crushing and heating the pellet until its atoms emit nuclear energy, a process called "ignition." *See* Pl.Ex. 1, at 7 (GAO Report).

The Federal Advisory Committee Act ("FACA"), 5 U.S.C.App. 2, imposes certain requirements on advisory committees established by the federal government that include members who are not "full-time officers or employees of the Federal Government." 5 U.S.C.App. 2 § 3(2); *see Food Chem. News v. Young*, 900 F.2d 328, 332 (D.C.Cir.1990). Plaintiffs, National Resources Defense Council ("NRDC") and TriValley CARE, filed this lawsuit against DOE and the Secretary of DOE on October 11, 2000. Plaintiffs' claims arise under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. They claim that DOE has violated FACA through its formation and use of committees to advise it on the ongoing construction of the NIF. In addition, they aver that DOE has a policy of convening advisory committees in violation of FACA.

Defendants contend that plaintiffs do not have standing to seek the requested relief. Furthermore, they claim that none of the challenged committees is subject to FACA for two primary reasons. First, they maintain that the committees are primarily "operational" and not advisory and, second, that FACA does not apply to committees that are composed solely of federal employees and employees of federal contractors. With respect to the High Ener-

gy Density Physics Study Panel ("HEDP Panel"), defendants further argue that it did not function as a group. Finally, defendants aver that plaintiffs' "pattern and practice" claim is not legally cognizable.

The Court finds that plaintiffs have demonstrated that they have standing to bring their claims under FACA and the APA. Plaintiffs' procedural injuries will be sufficiently redressed by the declaratory and injunctive relief they seek. *See Cummock v. Gore*, 180 F.3d 282 (D.C.Cir.1999); *Byrd v. Env'tl Protection Agency*, 174 F.3d 239 (D.C.Cir.1999).

The Court finds that DOE's establishment and use of three of the four challenged committees contravenes FACA. The record before the Court indicates that the committees are advisory in nature, and not purely "operational," as argued by defendants. The committees did not have the capability of acting on their own and, rather, provided advice to the Department. With respect to defendants' argument that FACA does not apply to committees comprised of federal contractors and federal employees, defendants have relied solely on case law and legislative history that supports a conclusion that federal contractors who themselves convene committees are not subject to the strictures of FACA. The only applicable statutory exemption from FACA's coverage is for committees composed wholly of federal employees and officers. *See* 5 U.S.C.App. 2 § 3(2). The Court finds no basis for creating a new exception to FACA for committees established by federal agencies that include individuals who are not employees of federal contractors. Accordingly, the Court holds that FACA applies to committees established by DOE that include members who are not federal employees or officers, and are employed by federal contractors.

However, with respect to the HEDP Panel, plaintiffs have failed to present any

evidence that would rebut defendants' claim that the panel did not function on a group. Consequently, the Court finds that FACA does not apply to DOE's establishment and use of the HEDP Panel.

Plaintiffs have established that DOE has a policy of convening committees without complying with FACA. Indeed, DOE avers that it has a written policy stating that status review committees are to be convened without conforming to FACA's requirements. Plaintiffs' claim is actionable pursuant to the APA, 5 U.S.C §§ 702, 704, and plaintiffs are entitled to a declaratory judgment on this claim. However, plaintiffs have failed to demonstrate that they are entitled to a court order that DOE give plaintiffs 60 days notice of its intent to convene a committee. Plaintiffs have failed to demonstrate that this requested relief is necessary or would be effective in remedying their asserted injuries.

The Court has carefully considered the parties' cross motions for summary judgment, the responses and replies thereto, the oral argument of counsel, the entire record herein, and the applicable statutory and case law. For the following reasons, the Court enters summary judgment for defendants, and against plaintiffs, on plaintiffs' claim that DOE's establishment and use of the HEDP Panel violated FACA. However, the Court enters summary judgment for plaintiffs, and against defendants, on plaintiffs' claims with respect to the Rebaseline Validation Review of the NIF ("Rebaseline Committee"), the two technical status review committees convened by DOE, and plaintiffs' claim that DOE has a policy of convening committees in violation of FACA. With the exception of plaintiffs' request that DOE be required to notify plaintiffs in advance of convening committees to advise it on the NIF, and whenever the use injunction is implicated, plaintiffs are entitled to their requested relief on these claims. The Court denies plaintiffs' request for an order requiring DOE to give plaintiffs notice of its intent to convene a committee, and denies without prejudice plaintiffs' request for notification of invocation of the use injunction.

## I. BACKGROUND

### A. Procedural History

This case initially concerned DOE's establishment and use of only one committee. Plaintiffs filed this lawsuit on October 11, 2000, contending that the Rebaseline Committee was subject to FACA. After plaintiffs requested a preliminary injunction, DOE reconvened many of the Rebaseline Committee members into a new committee, the Technical Status Review Committee (February 2001 Status Review Committee). Also in February 2001, DOE convened the HEDP Panel.

On March 28, 2001, this Court issued a preliminary injunction barring defendants from using the recommendations of either the Rebaseline Committee or the Status Review Committee outside of the Executive Branch and federal contractors, except in response to questions from Congress or the GAO, and then, only with a disclaimer.[1]

---

1. The Court-ordered disclaimer states:

 In litigation currently pending in the United States District Court for the District of Columbia, plaintiffs Natural Resources Defense Council and Tri–Valley CARES claim that the August 2000 Rebaseline Validation Review Committee violated the Federal Advisory Committee Act (FACA), 5 U.S.C.App. 2. The Department of Energy denies that FACA applies to this Committee. In form-ing and operating this Committee, the Department of Energy did not comply with any of FACA's requirements to ensure the committee is open to the public, balanced in terms of the points of view represented, and not inappropriately influenced by any special interest. This notice is made pursuant to the Court's order in that case, *Natural Resources Defense Council, et al. v. Abraham, et al.*, No. 00–CV–2431.

*See* Civ. Action. No 00–2431, Order of March 28, 2001, modified by Order of April 3, 2001.

On November 10, 2001, when DOE informed plaintiffs that it intended to convene another Technical Status Review Committee, the parties entered into a stipulation that the documents from the Technical Status Review Committee would be preserved pending the court's determination of whether the committee is subject to FACA.

In November 2001, and again in May 2002, DOE formed Technical Status Review Committees ("November 2001 Status Review Committee" and "May 2002 Status Review Committee"). Thus, subsequent to the filing of this lawsuit, DOE convened a total of four additional committees to advise it on the status of the NIF. On May 16, 2002, the parties filed a stipulation, in which they agree that, if the Court "rules that the November 2001 Technical Status Review Committee is covered by FACA, DOE will provide to plaintiffs" documents regarding the May 2002 committee.

Plaintiffs filed a supplemental complaint on June 4, 2002, in which they contend that DOE convened and used these additional four committees in violation of FACA. Plaintiffs, in their initial complaint and in their supplemental complaint, allege that each of the five committees was convened in violation of FACA and that DOE has a pattern and policy of utilizing committees in violation of FACA.

Plaintiffs seek five specific forms of relief. With respect to their claims that the five committees—the Rebaseline Committee, the HEDP Panel and three Status Review Committees—were subject to FACA and that DOE failed to convene the committees in accordance with FACA, plaintiffs seek declaratory relief, an injunction on use of the committee reports without an appropriate disclaimer that the committees operated in violation of FACA,

and disclosure of committee materials subject to public review pursuant to FACA. In addition, plaintiffs' supplemental complaint seeks an order requiring defendants to notify plaintiffs whenever the disclaimer is "invoked." With respect to their claim that DOE has a policy of establishing committees to advise it on the NIF in violation of FACA, plaintiffs seek declaratory relief and an injunction that would require DOE to inform plaintiffs of their intention to establish a committee 60 days before such a committee was created.

## B. Factual Background

The NIF, if completed, will be a unique 192–beam laser capable of compressing and heating a small capsule to conditions at which thermonuclear fusion and ignition occur. According to the government, the NIF is a key component of DOE's Stockpile Stewardship Program, the goal of which is to maintain the United States' nuclear arsenal without underground nuclear testing.

NIF was first proposed in 1990, and construction was commenced in May, 1997. Since the inception of the NIF project, scientists and organizations have raised significant concerns about the safety and feasibility of the NIF. *See* Pl.Ex. 3 ¶¶ 2, 21–23 (Payne decl.); Pl.Ex. 4 ¶¶ 3–10 (Kelley decl.); Pl.Ex. 5 ¶¶ 4–10 (Turner decl.); Pl.Ex. 6 ¶¶ 7–12 (Fulk Decl.). In 1997, NRDC sued DOE alleging that the construction of NIF was in violation of the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4332 et seq. In *NRDC v. Pena,* 972 F.Supp. 9, 11–13 (D.D.C.1997), this Court held that DOE's construction of NIF was in accordance with NEPA.

DOE's use of advisory committees in evaluating the NIF project has a long and complicated history, one that is tied to the development of the project and Congress'

sustained reluctance to fund the facility without the assurances of certain quality and cost controls. When DOE first announced its decision to begin constructing the NIF in early 1997, DOE estimated that the facility would cost $1.2 billion, and would be completed by 2003. *See* Pl.Ex. 1, at 10 (GAO Report). Two years later, in a June 1999 speech, then Secretary of Energy Bill Richardson announced that the NIF was "on time and within its budget." *See* Pl.Ex. 2, at 3. However, soon after this speech, DOE admitted that the NIF would cost an additional billion dollars to build, and would not be completed until at least 2008. *See* Pl.Ex. 1, at 7. Indeed, given these delays and the increase in predicted cost, a FACA-chartered committee considering the progress of the NIF recommended that construction of the facility not be initiated. GAO Report at 5. Yet, according to Secretary Richardson, "independent reviews" of the NIF performed after the FACA-chartered committee was disbanded had not identified existing technical problems. *See* Pl.Ex. 8 (DOE Press Release, 9/3/99).

In the fall of 1999, members of Congress were considering whether to terminate all funding for the NIF. Ranking chairs of the House of Representatives' committee overseeing the NIF explained that revelations regarding the NIF might "herald the demise of yet another large DOE construction project" because DOE had "obscure[d] key problems from Congress." Pl.Ex. 9, at 2 (Letter from Congressman F. James Sensenbrenner, Jr. and Congressman Ralph M. Hall to Comptroller General David M. Walker, 9/13/99).

To address concerns about possible technical problems with the NIF, Congress asked the General Accounting Office ("GAO") to prepare its own evaluation of the ongoing problems related to the NIF. *Id.* In addition, the 1999 Conference Report on continued appropriations for the

NIF explained that Congress was "very disappointed" with DOE's handling of the project, and instructed that "[a]dditional reviews [of the NIF] be performed in the coming months to establish the appropriate future actions for proceeding with this project." H.R. Conf. Rep. No. 336, 106th Cong., 1st Sess. at 96–7 (Sept. 27, 1999). The Conference Report further instructed that, unless DOE completed a new cost and schedule baseline by June 1, 2000, the Department must "prepare an estimate of the costs necessary to terminate the project." *Id.* at 97.

During the fall 2000 appropriation process, Congress again considered whether to continue to fund the NIF's construction. In a floor statement on September 7, 2000, Senator Tom Harkin opined that the NIF was a "massive public boondoggle," with "cost overruns, slipping schedules, and unsolved technical problems." 146 Cong. Rec. 8164–65 (daily ed., Sept. 7, 2000).

To respond to these concerns, DOE made a written presentation to Congress on September 14, 2000. *See* Pl.Ex. 21. In that presentation, DOE explained that it had conducted the "Rebaseline Validation Review," which concluded that "the rebaseline was credible [and] there is high confidence that the project can be successfully completed within the proposed cost and schedule. . . ." *Id.,* Attach. 1. DOE also submitted the Rebaseline Committee's report to Congress. *Id.* Furthermore, although the work of the NIF Task Force was not yet complete, the Chairman of the Task Force submitted a letter in which he stated that, in "view[ ] of the members" of the Task Force, the plans for completion of the NIF were "thorough and credible." *Id.,* Attach. 4.

Congress appropriated an additional $130 million for the NIF's construction in Fiscal Year 2001. However, Congress withheld $69 million of those funds until

such time as DOE submitted a "certification" recommending "an appropriate path forward for the project" and assuring that "all established project and scientific milestones have been met on schedule and on cost." *See* Dep't of Vet. Affairs & Housing & Urban Dev't Approp. Act, Pub. Law 106–377, 114 Stat. 1441 (Oct. 27, 2000). Congress mandated that this certification be made at some point after March 1, 2001.

In August 2000, GAO issued its findings on the progress of the NIF project. One of the principal conclusions of GAO's report was that no effective independent review of the NIF had been performed. Pl. Ex. 1, at 5, 13. The report noted that, while the NIF had "been frequently reviewed," the inadequacy of those reviews "bring[s] into question their comprehensiveness and independence." *Id.* at 33. Thus, the GAO report recommended that DOE "arrange for an outside scientific and technical review of the technical challenges remaining for NIF that could affect the project's cost and schedule risks." *Id.* at 6, 32.

In February 2001, as part of the effort to prepare recommendations in response to Congress' certification directive, DOE convened a Status Review Committee. The Status Review Committee included many of the members from the Rebaseline Committee. The February 2001 Status Review Committee authored recommendations that would permit DOE to obtain the Congressional certification necessary to receive the $69 million budgeted for fiscal year 2001.

On April 6, 2001, DOE submitted the certification to Congress.[2] *See* Pl.Ex. 27. In its certification, DOE relied upon the recommendations of the February 2001 Status Review Committee, as well as the

High Energy Density Physics Study Panel ("HEDP" Panel), which was also convened in February 2001. *See id.*

Subsequent to DOE's certification to Congress, GAO issued a follow-up report on the NIF that found that "[p]ersistent DOE oversight problems continue to place the NIF project at risk." Pl.Ex. 28, 4 (GAO letter to Senator John W. Warner, 6/1/2002). GAO reiterated its concern that the "NIF still lacks an independent external review process." *Id.* DOE again convened technical status review committees in November 2001 and May 2001.

## C. DOE's Use of Committees in the NIF Planning and Construction Process

From 1992 to 1995, DOE sought advice and recommendations concerning the NIF from the DOE Inertial Confinement Fusion Advisory Committee ("DOE–IC-FAC"), an advisory committee chartered and operated under FACA. The DOE–ICFAC recommended moving to the next step in the NIF project, which was to commence the "final design phase in FY 1997."

In 1995, DOE sought advice from a committee of the National Academy of Sciences' National Research Council called the Committee for the Review of the Inertial Confinement Fusion Program at the Department of Energy ("NAS–ICF Committee"). This committee did not comply with FACA's requirements. However, as defendants note, at the time that the NAS–ICF Committee was established, two rulings from this Court had held that National Academy of Sciences committees were not "advisory committees" within the meaning of FACA. *See Animal Legal Defense Fund v. Shalala,* 104 F.3d 424

---

**2.** This certification contained the disclaimer required by this Court's preliminary injunc-

tion. *See* Pl.Ex. 27.

(D.C.Cir.1997) (reversing 1995 district court ruling); *Lombardo v. Handler*, 397 F.Supp. 792 (D.D.C.1975). In January 1997, the D.C. Circuit, in *Animal Legal Defense Fund*, held that a National Academy of Sciences committee, which was utilized by the Department of Health and Human Services, was subject to FACA. 104 F.3d 424.

In February 1997, plaintiffs in this case brought a lawsuit against DOE challenging the failure of the NAS–ICF Committee to comply with FACA. Judge Friedman declared that DOE had violated FACA and prohibited DOE from further supporting the work of the challenged committee. *NRDC v. Pena*, Civ. Action No. 97–0308 (D.D.C. Aug. 6, 1997).

The D.C. Circuit upheld the district court's holding that the NAS–ICF Committee was subject to FACA, but remanded the case for discovery on the issue of whether the organizations had standing to seek an injunction, which would wholly prevent DOE from using the committee's report. *NRDC v. Pena*, 147 F.3d 1012, 1017 (D.C.Cir.1998). The parties settled the case prior to a decision on remand.

### 1. NIF Laser System Task Force, October 1999 [3]

In 1999, the Secretary of the Department of Energy requested that the Secretary of Energy Advisory Board ("SEAB"), a FACA-chartered committee, form a subcommittee to conduct an engineering and management review of the NIF laser system and recommend the best technical course of action. In October 1999, the NIF Laser System Task Force ("Task Force") was convened. This subcommittee was charged with reviewing the engineering and management aspects of the assembly and installation of the NIF laser system.

On November 12, 1999, DOE published a Federal Register notice acknowledging that the Task Force was subject to FACA. 64 Fed.Reg. 61625 (1999) (Pl.Ex. 14) (announcing meeting on Nov. 15–16, 1999). DOE contends that the Federal Register notice was erroneous and should be given no legal weight. While claiming that the Task Force was not subject to FACA, defendants nevertheless note that all Task Force meetings were open, noticed in the Federal Register, and included public comment opportunity. Plaintiffs maintain that the meetings were held within a few days of public notice of the meetings and, in one instance, before notice was given.

The Task Force Chairman communicated his views regarding the state of the NIF project directly to the Secretary of Energy. Defendants characterize the chairman's letter as a communication from the chairman only, and not a communication from the Task Force. *See* Def. Ex. 16 ("I am writing to give my personal impression of the present state of the [NIF] Project as well as my understanding of the views of the members of the [NIF Laser System Task Force] as they draft their final report."). While not a communication on behalf of the Task Force, the chairman's letter arguably conveys the advice of the Task Force members to the Secretary. The Task Force prepared an Interim and a Final Report that were submitted to DOE. Defendants maintain that the reports were first presented to, considered by and approved by the SEAB, and only then submitted by SEAB to DOE. The

---

**3.** The Court notes that plaintiffs' complaint does not seek specific relief from alleged FACA violations by DOE with respect to the NIF Laser System Task Force. However, plaintiffs refer to the DOE's use of the NIF Laser System Task Force in their claim that DOE has a policy of using advisory committees in violation of FACA. Accordingly, the Court briefly sets forth the history of the task force.

SEAB report and the Task Force report were submitted to Congress.

### 2. Rebaseline Validation Review of the NIF, June 2000

In June 2000, DOE established the Rebaseline Committee. The purpose of the review was to "validate the revised project baseline" and to "identify any issues that must be addressed so that the Department can have a high level of confidence that the project will be successfully executed according to the Baseline." *See* Rebaseline Report.

The Rebaseline Committee did not file a charter as required by FACA and failed to make the required determinations that the committee was necessary. While plaintiffs maintain that the committee met entirely in secret, defendants note that the formation of the Rebaseline Committee was announced in a letter to Congress.

The Rebaseline Committee included DOE employees, employees of DOE contractors and other non-federal employee members. *Id.* at App. B. Plaintiffs contend that the committee was not balanced in terms of points of view and that members of the committee had conflicts of interest.

The Rebaseline Committee met in August 2000 without any public participation or notice, and issued its report the same month. Some documents relating to the Rebaseline Committee are available to the public in the Public Reading Room at DOE's Oakland Operations Office. *See* Anderson Decl. ¶ 12 (stating that briefing materials for the Rebaseline Committee, with business proprietary and personnel information removed, are available in reading room).

Plaintiffs filed this lawsuit on October 11, 2001 seeking to enjoin DOE from relying on the Rebaseline Review. The reports of the Task Force and the Rebaseline Committee were submitted as part of DOE's certification of the revised NIF baseline that was mandated by Congress. Pursuant to this Court's preliminary injunction, the Rebaseline Review, as well as the report of the February 2001 Status Review Committee, was accompanied by a disclaimer. The injunction restricted the defendants to sharing the reports within the executive branch and, only upon request, with Congress.

### 3. Status Review Committee, February 2001

In February 2001, DOE reconvened many of the members of the Rebaseline Committee in a Status Review Committee. This committee was charged with determining how the NIF project was progressing in terms of the approved schedule and costs.

The Status Review Committee included DOE employees, employees of DOE contractors and five individuals, who were not federal contractors or employees and served as technical advisors to some of the subcommittees. Only one of these technical advisors participated in a committee meeting. Defendants contend that the participation in this single meeting was inadvertent.

DOE did not file a charter for the Status Review Committee, and did not make a determination that the committee was necessary or ensure that its membership was balanced and free of conflicts of interest. Some briefing materials relating to the February 2001 Status Review are available in the Public Reading Room at DOE's Oakland Operations Office.

### 4. High Energy Density Physics Study Panel, February 2001

In February 2001, DOE convened the HEDP Panel to prepare further recommendations on policies to the NIF. DOE organized a High–Energy–Density Physics

Workshop at Sandia/California on January 30—February 2, 2001. According to defendants, the workshop was one source of information included in the HEDP Panel that DOE had undertaken in response to a Congressional mandate that DOE study alternatives to the NIF's 192–beam facility.

HEDP panel members listened to presentations and asked questions of the presenters. The panel members then provided opinions to DOE by answering written questionnaires. Defendants contend that the panel members provided individual opinions to DOE, with DOE independently drafting the HEDP Study Report.

DOE did not file a charter for the HEDP Panel and made no findings that the entity was necessary. Furthermore, plaintiffs contend that DOE did not ensure that the committee membership was balanced or free from conflicts of interest. The members of the panel included federal employees and employees of DOE laboratories. Defendants assert that the laboratory employees provided advice on matters within the scope of their contracts.

In April 2001, the National Nuclear Security Administration ("NSAA") Administrator certified to Congress that NIF was on schedule and within its budget. In making this certification, the Administrator attached a copy of DOE's HEDP Study Report and relied upon, but did not attach, the February 2001 Status Review Report. However, DOE did not submit the recommendation of the individual study panel members to Congress.

### 5. Technical Status Review Committees, November 2001 and May 2002

In November 2001, NNSA convened a limited Technical Status Review Committee to prepare further recommendations on policies related to NIF. Specifically, the review was to determine if the construction project was still on schedule and within budget.

DOE did not file a charter for this committee, nor did it make a finding that the committee was necessary. The members of the committee included federal employees and employees of DOE laboratories. Unlike the earlier status review committee, this committee did not include private consultants. Plaintiffs contend that the membership of the committee was not balanced in viewpoints represented and was not free from conflicts of interests.

On November 10, 2001, the parties entered into a stipulation that the committee documents would be preserved pending this court's determination whether the committee is subject to FACA. In May 2002, the parties filed a similar stipulation that was approved by this Court with respect to another technical status review committee, which was convened in May 2002.

DOE intends to convene technical status review committees on a regular basis to provide further recommendations on the NIF. DOE admits that these groups may well include DOE contractors, as well as DOE employees. However, DOE contends that such committees are not subject to FACA to the extent that they are convened to review the cost, schedule and technical progress of the federal contractor that is constructing the NIF.

## II. ANALYSIS

Plaintiffs allege that, for the past five years, DOE has engaged in a pattern and policy of establishing and using advisory committees in order to bolster the "political legitimacy" of the multi-million dollar NIF without complying with the basic public accountability and access provisions of FACA, 5 U.S.C.App. 2. Plaintiffs ask this Court to provide relief from the asserted FACA violations occurring thus far, and,

in order to prevent future DOE violations of FACA, to declare that DOE's policy of convening committees in violation of FACA is unlawful and to require DOE to give notice of its intent to establish committees to advise it on the NIF.

Defendants argue that plaintiffs do not have standing to raise their claims and that plaintiffs' request for relief is moot with respect to the individual committees. Further, defendants maintain that none of the NIF advisory committees that DOE has established and used to date are "advisory committees" within the meaning of FACA. While apparently admitting that the committees have been "established" by DOE, the agency contends that all of the committees at issue in this case were concerned with "operative" functions, as opposed to "advisory" ones. Defendants also contend that the inclusion of federal contractors on some of the committees is not sufficient to trigger FACA's provisions. Finally, with respect to the HEDP Panel, defendants maintain that the panel members gave individual advice and opinions and, thus, did not function as a "group" subject to FACA.

## A. Standard of Review

Pending before the Court are cross motions for summary judgment. Summary judgment is granted pursuant to Fed. R.Civ.P. 56 only when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If a party opposing summary judgment "fails to make a showing essential to establish the existence of an element essential to that party's case, and in which that party will bear the ultimate burden of proof at trial," summary judgment is appropriate. *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. In ruling on cross motions for summary judgment, the court will grant summary judgment only if one of the mov-

ing parties is entitled to judgment as a matter of law upon material facts that are not in dispute. *See Rhoads v. McFerran*, 517 F.2d 66, 67 (2d Cir.1975).

There are no genuinely disputed material facts that preclude summary judgment in this matter. The parties do not disagree about the composition of the committees, their charge, or, for the most part, their structure.

## B. Federal Advisory Committee Act

The Federal Advisory Committee Act, 5 U.S.C.App. 2, was enacted in 1972 in an attempt to curtail the unfettered use of advisory committees by the federal government that were not subject to any formal processes or public scrutiny. Through FACA, Congress sought:

> to ensure that new advisory committees be established only when essential and that their number be minimized; that they be terminated when they have outlived their usefulness; that their creation, operation, and duration be subject to uniform standards and procedures; that Congress and the public remain apprised of their existence, activities, and cost; and that their work be exclusively advisory in nature.

*Public Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 446, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989). In relevant part, FACA defines an "advisory committee" as:

> any committee, board, commission, council, conference, panel, task force, or other similar group, or any subcommittee or other subgroup thereof ..., which is -
> ... (C) established or utilized by one or more agencies, in the interest of obtaining advice or recommendations for the President or one or more agencies or officers of the Federal Government except that such term excludes ... (iii) any committee which is composed wholly of full-time officers

or employees of the Federal Government.

5 U.S.C.App. II § 3(2).

FACA imposes certain restrictions on federal agencies. To the extent that a federal agency establishes or utilizes an advisory committee, the agency is required to make affirmative findings that the committee is necessary, and to file a charter for the committee. *Id.* § 5(b)-(c). Advisory committee membership is to be "fairly balanced in terms of the points of view represented and the functions" the committee performs. *Id.* In addition, the public is entitled to advance notice of advisory committee meetings and, subject to FOIA limitations, is entitled to inspect advisory committee documents. The committee must also keep detailed minutes of meetings. *Id.*

Section 10(b) of FACA governs the public disclosure of advisory committee materials. It provides:

> Subject to [FOIA], the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by each advisory committee shall be available for public inspection and copying at a single location in the offices of the advisory committee or the agency to which the advisory committee reports until the advisory committee ceases to exist.

5 U.S.C.App. II § 10(b). Thus, an advisory committee covered by FACA must maintain a reading room and grant the public access to certain documents prepared for and by the committee.

The parties agree that FACA does not provide a private cause of action. The Supreme Court's recent decision in *Alexander v. Sandoval*, 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001), mandates a finding that FACA creates no private cause of action. *Sandoval* restricts courts from implying the existence of a private cause of action under a statute where the plain intent of that statute does not create a cause of action. 532 U.S. at 286–87, 121 S.Ct. 1511 ("Statutory intent on this latter point is determinative.... Without it, a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute.") (internal citations omitted). The *Sandoval* Court rejected the "understanding of private causes of action that held sway 40 years ago," which permitted courts to imply a cause of action if to do so would be consistent with the purpose of the statute at issue. *Id.* Nothing in the text of FACA supports a finding that Congress intended to create a private right to sue. While FACA clearly creates statutory rights and duties, *see Cummock v. Gore*, 180 F.3d 282 (D.C.Cir.1999), this alone is insufficient to create a private remedy.[4] Consequently, plaintiffs' claims arise under the Administrative Procedures Act ("APA").

Plaintiffs allege that, by failing to comply with FACA, defendants have acted arbitrarily and capriciously, not in accordance with law, and without observation of procedure required by law, in violation of the APA. 5 U.S.C. § 706(2)(A), (D) ("The reviewing court shall ... hold unlawful

---

4. The Court recognizes the existence of precedent that has proceeded pursuant to FACA without necessarily holding that FACA violations arise under the APA. *See Judicial Watch v. Nat'l Energy Policy Dev. Group*, 219 F.Supp.2d 20, 33–34 (D.D.C.2002) (citing *Public Citizen*, 491 U.S. 440, 109 S.Ct. 2558, 105 L.Ed.2d 377; *Cummock*, 180 F.3d 282; *Ass'n of Am. Physicians v. Clinton*, 997 F.2d 898 (D.C.Cir.1993) ("*AAPS*")). However, none of these cases directly addressed the issue of whether FACA creates a private right of action, and, in any event, the rule of *Sandoval* is controlling for this Court's consideration of plaintiffs' claims. *Id.*

and set aside agency action, findings, and conclusions found to be—(A) arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law ... (D) without observance of procedure required by law.").

## C. Article III Case or Controversy Requirements

■ Defendants maintain that plaintiffs do not have standing to bring this action and that the case is moot. Both challenges implicate this Court's jurisdiction. It is well-settled that the exercise of judicial power authorized by Article III of the United States Constitution depends on the existence of a live case or controversy. *See, e.g., Preiser v. Newkirk,* 422 U.S. 395, 401, 95 S.Ct. 2330, 45 L.Ed.2d 272 (1975).

■ To meet constitutional standing requirements, plaintiffs must demonstrate that they have suffered a particularized injury to a cognizable interest, that the injury is fairly traceable to the defendant's actions, and that a favorable judicial ruling is likely to redress the injury. *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Thus, as a threshold matter, the plaintiffs must be able to allege and prove "a distinct and palpable injury" caused by the alleged FACA violations. *Id.* To survive a motion for summary judgment, plaintiffs must demonstrate that they have "raised a genuine issue of fact as to whether an 'agency action' taken ... caused [plaintiffs] to be 'adversely affected or aggrieved ... within the meaning of a relevant statute.'" *Lujan v. National Wildlife Federation,* 497 U.S. 871, 885, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990).

■ An organization has standing to sue on behalf of its members if "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). Here, plaintiff organizations have proffered affidavits demonstrating that the interests asserted by them are germane to their organizations' interests. Further, individual members' participation is not necessary for maintenance of this lawsuit. Accordingly, the Court focuses its analysis on the question of whether individual members of plaintiff organizations would have standing to bring the claims asserted.

■ The issue of plaintiffs' standing is inextricably tied to whether a live controversy exists in this matter. A case is moot when it "has lost its character as a present, live controversy of the kind that must exist if [the court] is to avoid advisory opinions on abstract questions of law." *Schering Corp. v. Shalala,* 995 F.2d 1103, 1106 (D.C.Cir.1993). Some injury to plaintiffs must continue to exist, and must continue to be redressable by the relief sought. Thus, the Supreme Court has described mootness as "the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Arizonans for Official English v. Arizona,* 520 U.S. 43, 68 n. 22, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997) (quoting *United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 397, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980)). However, Article III is satisfied, and a case will not be moot, when a "partial remedy" exists. *Calderon v. Moore,* 518 U.S. 149, 150, 116 S.Ct. 2066, 135 L.Ed.2d 453 (1996); *Cummock,* 180 F.3d 282, 293 (D.C.Cir.1999) (availability of some relief barred finding that case was moot).

### 1. Plaintiffs' Injury

Plaintiffs have sufficiently demonstrated an injury in fact, which arises from defendants' claimed violations of FACA. Plaintiffs claim two types of injuries. First, they assert procedural injuries arising from defendants' failure to comply with FACA and, in particular, defendants' failure to disclose documents pursuant to FACA, to make the finding that the committees in question were necessary and to ensure that the committees' membership was balanced and free of conflicts of interest. Second, plaintiffs aver that their members' health and environmental interests are injured as a result of the risks posed to the members by construction of the NIF. Because the Court finds that plaintiffs have demonstrated a procedural injury sufficient for standing purposes, the Court need not consider plaintiffs' assertions of possible health and environmental risks to their members.

■■ Plaintiffs have standing to challenge the failure of an agency to comply with procedural requirements if those requirements were "designed to protect some threatened concrete interest" of plaintiffs. *Lujan* at 573 n. 8, 112 S.Ct. 2130. In *Florida Audubon*, the D.C. Circuit relied on the Supreme Court's holding in *Lujan*, noting that "in cases in which a party 'has been accorded a procedural right to protect his concrete interests,' the primary focus of the standing inquiry is not the imminence or redressability of the injury to the plaintiff, but whether a plaintiff who has suffered personal and particularized injury has sued a defendant who has caused that injury." 94 F.3d at 664 (quoting *Lujan*, 504 U.S. at 572 n. 7, 112 S.Ct. 2130). A plaintiff "must show that the government act performed without the procedure in question will cause a distinct risk to a particularized interest of the plaintiff." 94 F.3d at 664.

In *Public Citizen v. Department of Justice*, public interest groups argued that the ABA committee that advised the Attorney General on judicial nominations was subject to FACA. 491 U.S. 440, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989). Defendants argued that the groups lacked standing to bring suit because the injury alleged was a general grievance shared by a large number of people and because a decision in their favor would be unlikely to redress the alleged harm. *Id.* at 448–49, 109 S.Ct. 2558. Specifically, the ABA suggested that the ABA committee's meetings and minutes and records would be closed to the groups seeking access, and thus the alleged injury was not redressable. *Id.*

The Supreme Court strongly rejected the ABA's challenges to the groups' standing. *Id.* The groups brought suit in a clear attempt to compel the Justice Department and the ABA Committee to comply with FACA's provisions. *Id.* at 450, 109 S.Ct. 2558. "As when an agency denies requests for information under the Freedom of Information Act, refusal to permit appellants to scrutinize the ABA Committee's activities to the extent FACA allows constitutes ·sufficiently distinct injury to provide standing to sue." *Id.* at 449, 109 S.Ct. 2558. The Court further noted that cases decided under FOIA have "never suggested" that plaintiffs needed to show anything more than that they had sought and been denied specific information from federal agencies. *Id.* Similarly, the Court held that the plaintiffs "might gain significant relief" were they to prevail in arguing that the ABA Committee should be subject to FACA, despite the fact that some meetings would be closed and some minutes and records withheld from disclosure. *Id.* at 450–51, 109 S.Ct. 2558.

The D.C. Circuit has read *Public Citizen* to hold that "a refusal to provide information to which one is entitled under FACA

constitutes a cognizable injury sufficient to establish Article III standing." *Byrd*, 174 F.3d at 243. Thus, in *Byrd*, the Circuit concluded that withholding of "timely access" to a committee's written comments and pre-meeting notes "directly caused [plaintiff's] informational injury." *Id.*

█ Plaintiffs' claim of procedural injury is clearly sufficient to establish standing. Plaintiffs assert that their members would have attended committee meetings and reviewed committee materials had the defendants complied with FACA with respect to the two status review committees, and the Rebaseline Committee and the HEDP Panel. Furthermore, plaintiffs assert that they are harmed by defendants' practice of establishing committees to advise it on the construction of NIF without complying with the strictures of FACA.

The Court is not persuaded by defendants' contention that *Florida Audubon Society v. Bentsen*, 94 F.3d 658 (D.C.Cir. 1996) (en banc), stands for the proposition that the instant plaintiffs must demonstrate that their alleged procedural injury implicates their alleged *environmental* and *health* injuries. *See* 94 F.3d at 665. In *Florida Audubon*, the D.C. Circuit held that, "[t]o be adversely affected *within NEPA*, [plaintiffs] must at least demonstrate that they can satisfy all constitutional standing requirements and that their particularized injury is to *interests of the sort protected by NEPA.*" *Id.* at 665 (emphasis added). The Circuit further explained that "standing *in an EIS matter* focuses on whether [plaintiffs] have shown a particularized environmental interest of theirs that will suffer demonstrably increased risk. . . ." *Id.*

Thus, in *Florida Audubon*, the Circuit described a "particularized injury" that would be sufficient to bring a claim under NEPA. While *Florida Audubon's* standing discussion arises from the Circuit's analysis of the constitutional minima for standing to assert claims pursuant to NEPA, the court's focus on "interests of the sort protected by NEPA" also reflects prudential standing concerns. The Supreme Court has articulated a "set of prudential principles that bear on the question of standing," one of which is a requirement "that the plaintiff's complaint fall within 'the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'" *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 474, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) (quoting *Assoc. of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970)).

█ *Lujan* and this Circuit clearly require that plaintiffs demonstrate that a "procedural norm be one 'designed to protect some threatened interest,'" in order to establish "standing to raise a procedural injury." *Animal Legal Defense Fund, Inc. v. Glickman*, 204 F.3d 229, 236 (D.C.Cir.2000) (quoting *Lujan*, 504 U.S. at 573 n. 8, 112 S.Ct. 2130). However, the "zone of interests" to be considered by a court is necessarily tied to the statute under which plaintiffs bring suit. Because *Cummock v. Gore* considered a plaintiff's standing to bring claims under FACA, it is more instructive than *Florida Audubon* for purposes of evaluating these plaintiffs' standing. In *Cummock*, the court found that plaintiff "suffered an injury under FACA insofar as the Commission denied her requests for information that it was required to produce." 180 F.3d at 290 (citing *Public Citizen*, 491 U.S. at 449, 109 S.Ct. 2558). Thus, for purposes of determining whether plaintiffs have asserted an injury sufficient for constitutional standing purposes, plaintiffs' assertion that they have been denied access to materials to which they have a statutory right is sufficient. *Id.; see Public Citizen*, 491 U.S. at

449, 109 S.Ct. 2558; *Byrd v. EPA,* 174 F.3d 239, 243 (D.C.Cir.1999) ("According to the Supreme Court, a refusal to provide information to which one is entitled under FACA constitutes a cognizable injury sufficient to establish Article III standing"). Further, plaintiffs' injury is directly caused by DOE's alleged violations of FACA. *See Cummock,* 180 F.3d at 290.

## 2. Redressability and Mootness

To satisfy constitutional standing requirements, plaintiffs must also demonstrate that a favorable decision by this Court would redress the injuries that they allege. *Id.* The extent to which plaintiffs' procedural injuries are redressable is, to a large extent, tied to this Court's consideration of defendants' mootness arguments. A case is moot when it "has lost its character as a present, live controversy of the kind that must exist if [the court] is to avoid advisory opinions on abstract questions of law." *Schering Corp. v. Shalala,* 995 F.2d 1103, 1106 (D.C.Cir.1993). However, "even the availability of a 'partial remedy' is 'sufficient to prevent [a] case from being moot.'" *Calderon v. Moore,* 518 U.S. 149, 150, 116 S.Ct. 2066, 135 L.Ed.2d 453 (1996). Accordingly, the Court must consider the relief requested by plaintiffs in determining whether that relief is available, and whether it will remedy an injury complained of by plaintiffs. *See NRDC I,* 147 F.3d at 1012 (remanding because plaintiffs had not shown that the permanent "'use injunction' redresse[d] any of . . . [their] claimed injuries").

In *Public Citizen,* the plaintiffs sued for injunctive and declaratory relief based on the Justice Department's failure to abide by FACA in consulting with the ABA's Standing Committee on the Federal Judiciary. 491 U.S. 440, 109 S.Ct. 2558, 105 L.Ed.2d 377. Plaintiffs sought to enjoin the Justice Department from "utilizing the ABA Committee as an advisory committee until it complied with FACA." *Id.* at 447,

109 S.Ct. 2558. The ABA argued that plaintiffs "have not demonstrated that a decision in their favor would likely redress the alleged harm, because meetings they seek to attend and the minutes and records they seek to review would probably be closed to them under FACA." *Id.* at 448–49, 109 S.Ct. 2558. However, the Supreme Court rejected this argument, finding that "[a]ppellants' potential gains are undoubtedly sufficient to give them standing." *Id.* at 449, 109 S.Ct. 2558. The Court observed that a favorable ruling would permit the appellants to obtain some documents, attend some meetings, and require the committee to comply with the charter and notice provisions of FACA. *Id.* at 450, 109 S.Ct. 2558.

As an initial matter, the Court rejects defendants' suggestion that the "policy decision" to build NIF is final and that, consequently, no injury identified by plaintiffs is redressable. It is clear from the record that plaintiffs' procedural injuries do not rest on whether the decision to build NIF is final. Furthermore, the continuing Congressional oversight of the NIF project, and requirements that DOE certify compliance with construction schedules, budgets and milestones suggests that the decision is not nearly as "final" as the defendants portray it.

Plaintiffs must have standing for each form of relief sought. *Friends of the Earth v. Laidlaw Envt'l Servs.,* 528 U.S. 167, 185, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). In particular, the Court's redressability analysis must necessarily focus on the relief sought by the plaintiffs. "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement." *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 107, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998).

Plaintiffs seek five distinct forms of relief. First, they seek a declaratory judgment that defendants have violated FACA with respect to their formation and use of each of the individual committees. Second, they request injunctive relief prohibiting defendants from using or referring to the committees without the use of a disclaimer. Related to this requested relief, plaintiffs seek a court order requiring defendants to notify them whenever this disclaimer is invoked. *See* Supp. Compl. ¶ 16(4). Additionally, plaintiffs seek injunctive relief that would require defendants to produce documents covered by Section 10(b) of FACA. Finally, plaintiffs ask for injunctive relief prohibiting defendants from convening any committees without providing 60 days' notice to plaintiffs. Because the parties have not briefed plaintiffs' request for notification of DOE's use of a disclaimer, the Court denies the requested relief without prejudice. The Court addresses plaintiffs' other requested forms of relief individually.

### a. Declaratory Relief

In arguing that a declaratory judgment would redress their procedural injuries and that there is a live controversy, plaintiffs rely on D.C. Circuit precedent that recognizes the import of a declaratory judgment in the arena of public opinion. In *Byrd v. Environmental Protection Agency,* the court held that plaintiff's injury resulted from the EPA's failure to release requested documents until "long after they would have been of any use to him." 174 F.3d 239, 244 (D.C.Cir.1999). The court reasoned that declaratory relief, therefore, would redress plaintiff's injury because it would give him "ammunition" for an attack on the committee's findings in subsequent agency proceedings that might seek to rely on the committee's report. *Id.* (citing favorably to *NRDC v. Pena,* 147 F.3d 1012). The court also suggested that declaratory relief might moti-

vate the EPA "to reevaluate and change peer review practices not in conformity with FACA." *Id.*

*Byrd* further held that plaintiff's request for declaratory relief was not mooted by the fact that relevant documents had been disclosed to the plaintiff and because the agency was no longer engaged in "any ongoing violation of FACA." *Id.* The Circuit noted that "[b]ecause Byrd's injury resulted not only from EPA's failure to provide him materials but also from the tardiness of their eventual release, his injury would be mooted if EPA convened another panel to review the [committee report] and provided him with all panel documents either before or at the meeting." *Id.*

In *Physicians Committee for Responsible Medicine v. Glickman,* this Court considered a similar issue. 117 F.Supp.2d 1 (D.D.C.2000). All of the documents requested by plaintiffs had been released to the public. *Id.* at 3. The plaintiffs, nevertheless, sought a declaratory judgment that the defendants had violated FACA by failing to release the documents on an ongoing basis. *Id.* They argued that the declaration would provide them with "valuable ammunition for publicly questioning the final Dietary Guidelines." *Id.* at 4. Noting that *Byrd* is controlling precedent, the court concluded that it was not for the court to judge how effective that "ammunition" would be. *Id.*

 A declaratory judgment from this Court would enable plaintiffs to publicly challenge the underpinnings and conclusions of the NIF committees established and utilized by DOE. Furthermore, granting such relief would be in keeping with Congressional intent that FACA provide some check on the operation of advisory groups. *See Public Citizen,* 491 U.S. at 446, 109 S.Ct. 2558. Accordingly, the Court finds that plaintiffs' request for de-

claratory relief is not moot despite the fact that the committees at issue have already been convened and disbanded by DOE. Furthermore, plaintiffs' request for declaratory relief with respect to DOE's practice of convening advisory committees to review the NIF in violation of FACA is not moot because defendants have conceded that this practice is ongoing.

### b. Injunctive Relief—Disclaimer on Use of Committee Reports

■ Plaintiffs request two forms of injunctive relief. One of these is a limited use injunction that would require defendants to place a disclaimer on any of the committee's materials that are distributed. To the extent that a court finds that a statutory violation has occurred, it has significant discretion in crafting equitable relief. Indeed, to the extent that a violation exists, the Court must provide *some* form of relief. *See U.S. v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 121 S.Ct. 1711, 149 L.Ed.2d 722 (2001). However, injunctions regulate future conduct and, accordingly, a party will have standing to seek injunctive relief only to the extent that it demonstrates a real and immediate threat of future injury.

The Rebaseline Committee report has been submitted to Congress and, apparently in reliance on this report, Congress has authorized continued funding for the NIF. Similarly, the HEDP Panel met for a limited period of time, after which a report was compiled and submitted to Congress; the Status Review Committees also made findings and recommendations that have been relied upon and relayed to Congress.

In *NRDC v. Pena*, the Circuit expressed doubts that the permanent use injunction awarded by the district court would redress any of plaintiffs' claimed injuries. 147 F.3d 1012, 1012 (D.C.Cir.1998). DOE argued that its use of the committee's report and work product would not cause

plaintiffs any injury, given that plaintiffs' alleged injury was their "exclusion from *past* Committee meetings and denial of access to Committee records and documents." *Id.* at 1021 (emphasis in original). Plaintiffs argued that the use injunction would redress both past and future injuries. *Id.* However, the Circuit distinguished the case from *Public Citizen*, noting that the Committee had been dissolved and would no longer meet or generate documents, and that the requested use injunction would not require "disclosure of any Committee documents or records." *Id.* at 1021. The court then turned to NRDC's argument that the use injunction would redress both past and future injuries by deterring/penalizing defendants. The court concluded that "[t]o the extent the appellees suggest that the use injunction serves the admittedly remedial purpose of deterring the Department from violating FACA *in the future*, in the absence of allegations regarding the likely occurrence of such violations, such a 'generalized interest in deterrence ... is insufficient for the purposes of Article III.' " *Id.* at 1022 (citing *Steel Co.*, 523 U.S. at 107, 118 S.Ct. 1003). Rather, appellants needed to show continuing, present adverse effects of the FACA violations. Id. (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 105, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983)) (finding that plaintiff's standing depended on whether he was likely to suffer future injury from the use of chokeholds by police officers).

■ In this case, plaintiffs—the same plaintiffs as those in *NRDC v. Pena*—seek more limited injunctive relief. They would have the Court permanently enjoin DOE from using the reports of the four disputed committees without a disclaimer stating that the committees had been convened in violation of FACA. The effect of this relief is, in many ways, similar to that of the

declaratory relief sought. Arguably, the disclaimer would give plaintiffs "ammunition" in the arena of public opinion. *See Byrd,* 174 F.3d at 244. To the extent that plaintiffs' injuries lie in the procedural violations by DOE, plaintiffs' members are hurt by their inability to effectively counter the recommendations of the NIF reports. This injury continues to date as DOE relies on the committee reports to certify to Congress that the NIF is being constructed in accordance with mandated guidelines.

In *NRDC v. Pena,* the Circuit recognized that NRDC and TriValley Care might have established standing for the use injunction by showing that the committee report would be used by DOE to continue NIF's construction or otherwise affect the future operation of NIF. 147 F.3d at 1024. Here, plaintiffs have clearly demonstrated the significance of the reports for continued funding and construction of NIF. A statement that the reports were prepared by committees convened in violation of FACA may at least indicate—to the savvy reader—that the committee membership may have been unbalanced and inflicted with conflicts of interest. Accordingly, the Court finds that plaintiffs have established that this form of relief is both available and will redress the injuries they assert.

### c. Release of Section 10(b) Documents

Defendants argue that plaintiffs have no legally cognizable interest in the release of the Section 10 documents because the committees in question no longer exist. The government advanced the identical argument in *Judicial Watch v. National Energy Policy Group,* Civ. Action Nos. 01–1530, 02–631; namely, that Section 10 creates an enforceable right only so long as a committee is in existence. *See* Def.'s Reply at 2 ("A plaintiff has a legally protected interest under Section 10 only when he seeks access to the FACA reading room while the advisory committee is still under an obligation to maintain such a room.").

Defendants rely primarily on the statutory language of Section 10(b), which mandates that certain documents be disclosed "until the advisory committee ceases to exist." 5 U.S.C.App. 2 § 10(b). While no court has discussed the significance of this language for the ability of plaintiffs to seek redress of violations of Section 10(b), defendants note that, in both *NRDC v. Pena* and *ALDF v. Shalala,* plaintiffs had sought and obtained injunctive relief before the committees disbanded. *NRDC,* 147 F.3d at 1015–16, 1026 n. 6; *ALDF v. Shalala,* 53 F.3d 363, 366 (D.C.Cir.1995) ("The District Court had enjoined appellees 'from destroying documents which pertain to the work of the committee' pending appeal."). In *Association of American Physicians and Surgeons, Inc. v. Clinton,* the D.C. Circuit avoided the question of whether the termination of a task force rendered the case moot by noting that the parties had "agreed" to the existence of a "live controversy." 997 F.2d 898, 898 n. 1 (D.C.Cir.1993); *but see Steel Co.,* 523 U.S. at 97, 118 S.Ct. 1003 (courts may not reach merits of a case by assuming jurisdiction).

Defendants suggest that plaintiffs may properly seek Section 10(b) materials through FOIA. They assert that this argument "does not exalt form over substance" because compliance with FACA would mandate that DOE maintain a reading room for the public. Thus, they suggest that requiring continued compliance with Section 10 would mean that the agency would have to maintain such a space indefinitely.

This Court has previously considered the legal theory posited by the federal defendants. In response, the Court explained:

[T]he ability of a court to award access to the documents as relief for previous violations of that duty is limited only by the existence of the documents.... Whether or not plaintiffs sue before or after the group terminated does not alter the allegation that the government failed to meet the substantive requirements of the statute during the relevant time-frame. Contrary to the federal defendants' argument here, the terms of the statute limit the scope of liability, not the availability of a remedy.

*Judicial Watch,* 219 F.Supp.2d at 29–30.

 A suit for injunctive relief ordering the release of documents pursuant to Section 10(b) may be mooted by the release of those documents. *See, e.g., Byrd,* 174 F.3d 239; *Physicians Comm. for Responsible Medicine,* 117 F.Supp.2d 1. Nevertheless, in *Cummock v. Gore,* the D.C. Circuit held that a request for documents pursuant to FACA is not rendered moot by the termination of the advisory committee in question. 180 F.3d 282. In *Cummock,* a member of a commission that was subject to FACA requested materials pursuant to Section 10(b) and was denied those materials. The member had written a dissenting statement to the commission's report without the Section 10(b) materials, but she argued that her statement would have been different had she been granted access to the Section 10(b) documents. The Circuit recognized that Section 10(b) " 'affirmatively obligates that Government to provide access to the identified materials.' " 180 F.3d 282, 289 (D.C.Cir.1999) (quoting *Food Chem. News,* 980 F.2d at

1472). The court found that Cummock's injury was redressable by a favorable decision of the court because she sought an opportunity to amend her dissent after a review of Section 10(b) materials. *Id.* at 290. After holding that Cummock had as much of a right to enforce FACA as any member of the public, the court cited *Byrd* for the proposition that the Circuit has "made it clear that FACA rights are enforceable even after an advisory committee has been disbanded." *Id.* at 292. The court held that Cummock had the right to review the Section 10(b) documents and to have her revised dissent disseminated together with the committee's report. *Id.* at 293.

 Here, plaintiffs' requested relief is not moot. A finding that disclosure of the documents was no longer available because the committees ceased to exist would allow agencies to frustrate the purposes of FACA by convening committees and disbanding them before materials could be requested, or a lawsuit concluded. The documents that plaintiffs request are still in existence and have not been produced to them.[5] This Court has the authority to provide equitable relief to remedy a statutory violation by defendants.

#### d. 60–Day Notice of Future Committees

 Plaintiffs' assertion that DOE's plan to continue using committees that do not comply with FACA clearly presents a live controversy. However, the specific relief requested as a remedy for this

---

**5.** To the extent that some, but not all, of the Section 10(b) documents produced for the Rebaseline Committee may be available in an Oakland reading room, the Court notes that this does not moot plaintiffs' request for relief. In the *AAPS* litigation, on remand, Judge Lamberth presided over the "almost moot" controversy between the parties; defendants, in an attempt to moot the case, publicly released Section 10 documents. *AAPS v. Clinton,* 879 F.Supp. 103 (D.D.C.1994). While Judge Lamberth found that not all relevant Section 10 documents had been disclosed, he noted that the court would lose Article III jurisdiction over the matter as soon as the defendant completed its release of all Section 10 documents. *Id.*

claim—a 60–day notice of DOE's intent to convene NIF committees—raises both redressability and ripeness concerns. Plaintiffs fail to point to record evidence that the 60 days notice would remedy the alleged harm caused by the practice of convening committees in violation of FACA. Presumably, plaintiffs intend to argue that 60 days notice is necessary to permit them to challenge the applicability of FACA to a given committee before it is convened. However, they fail to explain how the notice period would redress the injuries complained of. At this stage in the proceedings, the Court will not substitute its own supposition regarding plaintiffs' reasons for requesting specific remedies for those which plaintiffs have failed to assert and on which they fail to proffer evidence. Accordingly, the Court finds that plaintiffs have failed to demonstrate that their injuries would be redressed by their requested relief. The Court cannot, therefore, conclude that plaintiffs have standing to seek this form of injunctive relief for defendants' policy of convening committees in violation of FACA.

## D. Applicability of FACA to DOE NIF Committees

 FACA applies to groups that are "established or utilized ... in the interest of obtaining advice or recommendations for ... one or more agencies or officers of the Federal Government." 5 U.S.C.App. II, § 3(2). A committee is "established" by an agency where it is actually formed by the agency, and is "utilized" by an agency if it is "amenable ... to strict management by agency officials." *Public Citizen*, 491 U.S. at 452, 109 S.Ct. 2558; *see also Byrd*, 174 F.3d at 245–46 (describing *Food Chemical News* holding as defining "established" as indicating a "Government-formed advisory committee," and "utilized" as "encompass[ing] a group organized by a nongovernmental entity but nonetheless so closely tied to an agency as

to be amenable to strict management by agency officials."). In *Byrd*, the court noted that the determination of whether a committee was formed by a federal agency does not turn on a determination of who controls the methodology or operation of peer review. 174 F.3d at 246. Thus, a "work assignment" from an agency that defined the objective, method and scope of studies to be performed does not necessarily lead to a conclusion that the committee was formed by that agency. *Id.* In *Byrd*, the plaintiff unsuccessfully argued that the agency had "potential," but not actual, control over the panel selection process, and that the agency consequently created the panel in question. *Id.*

Here, NRDC argues that the various NIF committees at issue were established by DOE. With the exception of the NIF Task Force, which plaintiffs do not specifically challenge, defendants do not dispute that DOE created and convened the committees. DOE exercised control over the committees' structure, membership and work.

Defendants contend that FACA does not apply to any of the committees at issue in this litigation for four reasons. First, defendants contend that the committees are not subject to FACA because none of the committees gave "advice" to DOE on any specific government policy and that, rather, the committees performed operational functions. Second, defendants maintain that committees composed of federal employees and employees of federal contractors do not fall within the purview of FACA. Third, defendants at oral argument, for the first time, advanced the theory that the term "federal employees" may be construed to apply to federal contractors. Finally, defendants assert an argument that is, in essence, a combination of its first two arguments; specifically, they claim that management and operating ("M

& O") contractor employees may participate on committees without triggering FACA. In addition, defendants contend that the NEDP Panel did not operate as a group *per se*, and therefore is not subject to FACA.

In presenting each of their arguments, defendants urge this Court to narrowly construe the term "advisory committee," asserting that the legislative history of FACA mandates such a construction. While the Court addresses each of defendants' arguments in turn, as an initial matter, the Court considers defendants' position that courts must narrowly define the scope of FACA. It is true that the Supreme Court has cautioned against literal adherence to a dictionary reading of FACA's extremely broad definition of "advisory committee," stating that FACA simply was not "intended to cover every formal and informal consultation between the President or an Executive agency and a group rendering advice." *Public Citizen v. United States Dep't of Justice*, 491 U.S. 440, 452 n. 8, 453, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989). However, the Court's caution came in the context of its consideration of the meaning of the term "utilized" for purposes deciding whether a group had been "utilized" by the President, and was consequently an "advisory committee." Indeed, in *Public Citizen*, the Court engaged in an extensive discussion of the legislative history of FACA and concluded that Congress' intent would not be furthered by application of the plain meaning of the term "utilized."

Cases since *Public Citizen* that have heeded its instruction to narrowly draw the definition of an "advisory committee" have similarly been concerned with the term "utilized." *See, e.g., Ass'n of Am. Physicians v. Clinton*, 997 F.2d 898 (D.C.Cir.1993). This Court is not aware of any decision that has cited *Public Citizen* in the manner urged by defendants, that

*all* terms in FACA must be narrowly construed. *Cf. Miccosukee Tribe of Indians of Fla. v. Southern Everglades Restoration Alliance*, 304 F.3d 1076 (11th Cir.2002) (holding that "established," as used in FACA, should be given its plain meaning).

### 1. HEDP Panel

Defendants argue that the HEDP Panel is not an advisory committee in structure and that it is not subject to FACA because its members were federal employees and federal contractors' employees. Defendants maintain that plaintiffs' characterization of the HEDP "workshop" as an advisory committee is "overreaching and patently frivolous."

In *AAPS*, the D.C. Circuit held that "a group is a FACA advisory committee when it is asked to render advice or recommendations, *as a group*, and not as a collection of individuals." 997 F.2d 898, 913 (D.C.Cir.1993). Similarly, in *NRDC v. Herrington*, the court found that experts who were convened to give their individual opinions about the safety of a nuclear power plant, did not function as a group, and, indeed, created no work product as a group. 637 F.Supp. 116, 118–19 (D.D.C. 1986).

 Defendants contend that the HEDP workshop did not result in a collective group report. Rather, individual panel members listened to presentations, asked questions of the presenters, and then provided their individual opinions to DOE by answering the written workshop questions. *See* Keane Decl. ¶ 7. Thus, defendants argue that any input provided by the panel members was provided on an individual basis only and that there was no "committee." The final report was written by DOE's Chris Keane and his staff. Defendants cite the HEDP report's explanation of the methodology used to create the report to suggest that the panel operated

as individuals and not as a group. The report states: "The workshop study panel members assessed the weapons-physics applications of the HEDP baseline and the alternatives that were presented against the requirements presented by the laboratories, and individually made their findings and recommendations to DP." *See* Study Report, at 1. Perhaps more significantly, defendants state that study panel members' comments were only one source of information considered in preparing the final report. Other information relied upon came from discussions during the course of the study, and input from DOE laboratories and DP management. *See* Study Report, Ch. 1–3.

Defendants' evidence is unrebutted by plaintiffs. Plaintiffs merely argue in the abstract that DOE would not expend the resources to gather a group of specialists if it did not expect them to draw conclusions as a group. This bare supposition can not carry the day for plaintiffs. In response to defendants' motion for summary judgment, plaintiffs have failed to present any evidence that would suggest to the Court a genuinely disputed issue of fact with respect to the structure and organization of the HEDP Panel's work. Accordingly, the Court cannot but find that the HEDP Panel did not operate as a group, and is not an advisory group within the meaning of FACA.

**2. Advisory Nature of the Committees**

■ Defendants argue that all of the committees at issue in this litigation are not subject to FACA because they are not providing advice or recommendations on an "identifiable governmental policy." *See Judicial Watch, Inc. v. Clinton,* 76 F.3d 1232, 1233 (D.C.Cir.1996) ("Accordingly, we have recognized that [FACA] is limited to [established] committees that provide advice on an identified governmental policy."). However, that advice given by a committee may be hyper-technical or limited to assessing the project's progress will not detract from the committees' advisory nature. *See Northwest Forest Resource Council v. Espy,* 846 F.Supp. 1009, 1013 (D.D.C.1994) ("nothing in the statutory language or case law ... support[s] the defendants' assertion that FACA should not apply to 'advisory committees' consisting only of technicians who supply the decision-makers with data. To the contrary several courts have applied FACA in just such circumstances.").

In *Judicial Watch v. Clinton,* the Circuit considered whether the Presidential Legal Expense Trust Fund was covered by FACA. 76 F.3d 1232. The court found that the Trust, to the extent that it offered advice on the legality of and the methods for soliciting and distributing funds, did not offer advice "directed to governmental policy." *Id.* at 1233. The court rested its conclusion that FACA "is only intended to reach committees that offer policy advice" on the statute's "requirement that such a committee's membership be 'fairly balanced in terms of the points of view represented' and not 'inappropriately influenced by the appointing authority or by any special interests.'" *Id.* (quoting 5 U.S.C.App. 2 § 5(b)(2)-(3)). This provision "surely indicates that Congress had in mind committees, the members of which would provide varying points of view; and that necessarily implies *debatable policy issues.*" *Id.* (emphasis in original).

Defendants also suggest that the committees' advice cannot pertain to governmental policy because it is "operational advice" and falls outside the purview of FACA. In advancing its theory that FACA distinguishes between "policy advice" and "operational advice," defendants again rely on *Public Citizen's* caution against a literalistic reading of FACA that would bring within the Act's ambit "far more groups

and consulting arrangements than Congress could conceivably have intended." 491 U.S. at 464, 109 S.Ct. 2558. Yet, as discussed previously, *Public Citizen's* narrow interpretation arose from its concern that groups "utilized" by the President and federal agencies not be read too expansively. By its terms, FACA applies to committees established by an agency "in the interest of obtaining advice or recommendations" for the agency. 5 U.S.C.App. 2, § 3(2)(C); *see also NRDC I,* 147 F.3d at 1017 n. 1 (suggesting that how a committee is created is more significant in determining FACA coverage than how the committee is used).

The D.C. Circuit has recognized a distinction between groups that are "operational" and those that are advisory to the federal government. *Sofamor Danek Group, Inc. v. Gaus,* 61 F.3d 929, 935 (D.C.Cir.1995). The *Sofamor* court turned to FACA's legislative history for guidance in interpreting the term "advisory." The House Report stated: "[t]he term advisory committee as used in this bill does not include committees or commissions which have operational responsibilities. Only those committees established for the purpose of obtaining advice are within the bill's definition." H.R.Rep. No. 1017, 92d Cong., 2d Sess. 4, *reprinted in* 1972 U.S.C.C.A.N. 3491, 3494. The Senate Report also drew a distinction between advisory and operational committees, noting that if a committee is "primarily operational, rather than advisory," it would not be covered by FACA. S.Rep. No. 1098, 92d Cong., 2d Sess. 8 (1972); *see also Judicial Watch v. Clinton,* 76 F.3d at 1233 (FACA is "limited to committees that provide advice on an identified governmental policy.").

Yet, *Sofamor* did not delineate between operational advice and policy advice, as defendants suggest. Rather, in *Sofamor,* the Circuit looked to the expressly stated purpose for the establishment of the groups in question to determine whether they were operational or advisory. 61 F.3d at 935. The Circuit explained that it would not infer any other purpose to the groups beyond those expressly stated. *Id.* However, in *California Forestry Association v. U.S. Forest Service,* in the absence of an express statutory purpose, the Circuit considered how a committee's report would be used in determining whether the committee provided "advice." 102 F.3d 609, 613 (D.C.Cir.1996). The court found that the use of the research panel's report was not "subsequent and optional." *Id.* Although the report was submitted to Congress, and not to the Forest Service, the clear purpose of the report was to advise the federal agency. *Id.*

In *Public Citizen v. Commission on the Bicentennial,* this Court found that a committee is more operational than advisory when it has the ability to implement its own recommendations. 622 F.Supp. 753, 757–58 (D.D.C.1985) (Where a commission "does not render advice to the federal government, but instead fulfills its substantive and active duties as listed in its creating statute," it is "not an advisory committee within the meaning of the FACA."). Similarly, in *HLI Lordship Industries v. Committee for Purchase from the Blind & Other Severely Handicapped,* the district court found that a committee's "operational" functions dominated its advisory nature where the committee was charged with setting fee schedules for a federally approved program. 615 F.Supp. 970, 978 (E.D.Va.1985).

Defendants rely heavily on the district court decision in *NRDC v. Herrington,* 637 F.Supp. 116 (D.D.C.1986), in arguing that the committees at issue in this case did not provide advice to DOE. Yet, the court did not base its findings on the distinction between operational and advisory commit-

tees. Furthermore, the reasoning of the *Herrington* court clearly indicates that the court was swayed by its consideration of factors not present in the instant case. In *Herrington*, immediately following the explosion at the Chernobyl Nuclear Power Station, the DOE Secretary quickly gathered an "ensemble of experts" to provide expedited advice and recommendations on the safety of the one nuclear plant of similar construction in the United States. *Id.* at 118. The court found that the experts gave individual opinions as to the safety of the power plant, and noted that FACA was not intended to inhibit the Secretary's ability to get quick advice from specialists. *Id.* at 120. Clearly, the court was concerned that the experts did not function as a group, and that the emergency nature of the Secretary's formation of the group did not implicate concerns regarding use of advisory groups that had motivated the enactment of FACA. *Id.*

██ Defendants argue that committees convened to advise DOE on the progress and shortcomings of the NIF plans do not implicate an "identified governmental policy." *Id.* The very history of the NIF flies in the face of this argument. Clearly, assessing the progress and viability of the NIF is a technical matter. Yet, Congress held extensive debates regarding the facility's viability, and imposed restrictions on the project's funding in order to maintain ongoing oversight of the project. Congress clearly considers the viability of the NIF to be a matter of governmental policy.

Defendants' suggestion that the NIF's viability ceased to be a matter of governmental concern once DOE provided its certification to Congress is unconvincing in light of the mandates set for the committees. The Rebaseline Committee was asked to "identify any issues that must be addressed so that the Department can have a high level of confidence that the

project will be successfully executed." *See* Rebaseline Report, App. A. The first two Status Review Committees were asked "to determine if the project is performing to the approved schedule and cost," to recommend means of meeting those goals, and to assess the technical progress of the project. *See* Pl.Ex. 31 (Jan. 3, 2001 Mem.); *see also* Pl.Ex. 33 (Review Plan). While defendants portray the scope of the committees' work as technical, that does not detract from the fact that the committees' evaluations, recommendations and advice were sought by DOE on the precise issues that were of concern to Congress.

Finally, the record clearly supports a finding that the committees gave advice and recommendations to DOE. They were not "operational" committees charged with undertaking any task other than that of providing the department with advice and recommendations. Defendants do not argue that the committees had the authority to implement any of their recommendations with respect to the NIF. Further, the committees were not charged with setting a work schedule for the NIF. Rather, DOE convened the committees in order to receive their recommendations and advice regarding the progress of the NIF's construction.

### a. Rebaseline Committee

██ The Rebaseline Committee is the only committee challenged by plaintiffs as violative of FACA that had members who are not federal employees or employees of federal contractors. Accordingly, defendants' argument that FACA does not apply to the Rebaseline Committee rests solely on their theory that the Rebaseline Committee did not perform advisory functions.

The Rebaseline Committee was charged with undertaking a review of the NIF project, and validating a revised "baseline"

for the project that would delay project completion and increase the budget. As defendants explain, Congress did not want any "negative surprises," Def. Mem. at 11, and therefore required the Secretary of Energy to certify a new cost and schedule baseline for the NIF project and threatened that a cost-overrun or schedule delay could cause Congress to rethink funding of the project.

The Rebaseline Committee was therefore charged with identifying any issues that must be addressed in order for DOE to have a high level of confidence that the project may be successfully executed according to the Baseline. The Committee did not undertake to implement any suggestions. *Cf. Comm'n on the Bicentennial*, 622 F.Supp. at 758. Rather, it gave advice to DOE on how the department might successfully meet the tasks set for it by Congress. That the advice given to DOE was of a technical nature does not automatically transform the committee into an "operational" one. The express purpose of the committee, as well as the nature of the report and the manner in which it was used by DOE, all indicate that its function was advisory.

### b. Status Review Committees

▆▆ Plaintiffs challenge DOE's use of technical status review committees convened in February 2001 and November 2001.[6] Defendants refer to these committees as "semi-annual technical status review committees." The committees were charged with assessing the progress of NIF construction and advising DOE and the primary NIF contractor on ways of resolving any problems.

DOE argues that these reviews were "limited to monitoring the technical progress of the NIF's construction" and that the committees involved in the reviews did not consider any policy issues related to the NIF. Def. Mem. at 18. Defendants posit that because the committees did not recommend an overarching policy—such as the decision to build NIF—but rather recommended specific steps to improve the NIF project, they can not be advisory. However, in *Espy*, the District Court rejected the idea that a committee that made " 'technical assessment[s]' of various management options" did not provide advice within the meaning of FACA. 846 F.Supp. at 1013. The court noted that the committee "directly influenced the President's ultimate policy decision." *Id.*

Here, DOE relies upon the status reports in certifying to Congress that they are continuing to meet Congressional goals for the NIF project. That the evaluation performed by the committees may be technical, and their advice is likely also of a technical nature, does not detract from the fact that they are giving advice on implementing governmental policy. As such, the committees are advisory in nature.

### 3. Applicability of FACA to Federal Contractors

Defendants contend that FACA does not apply to the committees at issue because their members are employees of the federal government and of DOE contractors. Plaintiffs concede that the HEDP Panel and the technical status review committees, the three committees convened after the issuance of this Court's injunction, were composed solely of federal employees

---

**6.** Plaintiffs' motion for summary judgment challenges the use of February 2001 and November 2001 status review committees. While the Court notes that plaintiffs' supplemental complaint also alleges that the May 2002 status review committee was convened

and operated in violation of FACA, no evidence is before the Court regarding the May 2002 committee and no pending motion has argued for relief with respect to this most recent status review committee.

and DOE contractor employees. Pl.'s Mem. in Support of Mot. for Sum. Judg. at 24 n. 14.[7] The status review committees consisted of employees of DOE, its laboratories and five private individuals, who DOE contends acted as technical advisors. The Rebaseline Committee consisted of forty experts, several of whom appear to not be federal employees or contractors. Def. Ex. 20. At oral argument, defendants conceded that the Rebaseline Committee's membership included private individuals.

As an initial matter, the Court addresses an argument made by defendants for the first time at oral argument. Defendants suggested that employees of federal contractors should be considered to be federal employees for purposes of FACA. Defendants cited no case law for this proposition. The Court, nevertheless, notes that the *AAPS* court, in deciding whether the First Lady was a government employee suggested that the term "federal officer or employee" was ambiguous. *AAPS*, 997 F.2d at 904. However, even were the Court inclined to agree that the term "federal officer or employee" might be stretched to extend to employees of institutions with federal contract, the record does not support defendants' argument. There is no evidence documenting the federal contracts pursuant to which committee members are employed, or conduct their work. Thus, the Court need not reach this eleventh hour argument advanced by defendants.

■ Defendants make much of a sentence in the Conference Report on FACA.

In a section entitled "Applicability of the Provisions of the Act," the report states: "The Act does not apply to persons or organizations which have contractual relationships with Federal agencies nor to advisory committees not directly established by or for such agencies." 1972 U.S.S.C.A.N. 3508, 3509. The report offers no further explanation of this statement, nor does the context provide any guidance as to the statement's meaning. The House Report, which contained a similar provision, stated that the term "advisory committee" did not include a contractor or consultant hired by an officer or agency of the federal government. H.R.Rep. No. 1017, 92 Cong., 2d Sess. 4, *reprinted in* U.S.C.C.A.N. 3491, 3494 (1972).

Defendants argue that this legislative history of FACA mandates the conclusion that a committee composed of federal employees and federal contractors' employees is not subject to FACA. In *Food Chemical News v. Young*, the D.C. Circuit relied upon FACA's legislative history to hold that FACA does not apply to a committee convened by a contractor to the federal government. 900 F.2d 328, 329, 331 (D.C.Cir.1990). The private scientific organization, pursuant to a contract with the Food and Drug Administration, selected and managed a group of experts to provide counsel on food and cosmetics safety issues. *Id.* at 329–30. The court noted that federal contractors are subject to procurement regulations and reporting procedures that provide significant quality control of their work. *Id* at 331. Therefore, the

---

7. Plaintiffs note that all three committees included federal contractors other than the three principal DOE laboratories, Livermore Lab, Sandia National Laboratory and Los Alamos National Laboratory. *See* Pl.Ex. 26 (Status Review Committee membership); Pl.Ex. 28 at 1–7 (HEDP Panel membership); Pl.Ex. 18 at ¶ 4 (Second Kelley Decl., summarizing Technical Status Review Committee membership). For example, of 18 DOE laboratory employees on the Status Review Committee, only 3 are from the principal laboratories, and none are from Livermore Laboratory. Thus, this case does not present the question of whether a committee that was solely comprised of federal employees and employees of the Livermore lab—or of all three DOE laboratories—would fall within the purview of FACA.

court concluded that federal contractors need not comply with FACA requirements when they convene committees.

While the Supreme Court, in *Public Citizen*, quoted the Conference Report's "exclusion" of federal contractors from FACA coverage, it did so in the context of interpreting the word "utilized." 491 U.S. at 461, 109 S.Ct. 2558. Holding that a literal interpretation of the term "utilized" would produce an absurd result, the Court at-tempted to interpret the term through the lens of Congressional intent. 491 U.S. at 454, 109 S.Ct. 2558 ("Where the literal reading of a statutory term would 'compel an odd result,' ... we must search for other evidence of congressional intent to lend the term its proper scope."). The Supreme Court sought to find a sufficiently narrow definition of the word "utilized" so as not to include any committee relied upon by the federal government. In such a context, the exclusion of committees convened by federal contractors is entirely reasonable.

Wholly different policy concerns are implicated by a group that is composed of federal employees and employees of federal contractors, where the federal contractors are providing advice on a project that lies outside of their specific contract. Here, the federal contractors' employees are not responsible for the work product—rather, they are participating in the committees in order to give advice and recommendations to DOE on how the department should carry out its work. Thus, to the extent that the legislative history indicates that an exclusion exists for "federal contractors," it should be read as excluding the activities of federal contractors that use committees in the course of their work. Indeed, every court that has relied on this language has interpreted it in this way. *See, e.g., Food Chem. News,* 900 F.2d at 331. To create a new exception by "stacking" the current statutory exception

for federal employees with the exception indicated in the legislative history for activities of federal contractors, would be to create an enormous loophole in the statute.

 No more availing is defendants' argument that FACA contains a more narrow exception for participation of management and operating ("M & O") contractor employees on committees. They contend that the role of DOE M & O contractor employees who participate in groups reviewing the status of the NIF is necessarily operational and related to the performance of the M & O contracts.

Defendants simply reiterate the arguments used to support the two "exceptions" that they claim for "operational" committees and for "federal contractors" in support of this argument, and then rely on the GSA FACA regulations to suggest that M & O contractors must receive a special status under FACA. The regulations present the following question and answer:

> 4. Is the Act applicable to meetings between agency officials and their contractors, licensees, or other 'private sector' program partners?

> The answer to question 4 is no. Agencies often meet with contractors and licensees, individually and as a group, to discuss specific matters involving a contract's solicitation, issuance, and implementation, or an agency's efforts to ensure compliance with its regulations. Such interactions are not subject to the Act because these groups are not "established" or "utilized" for the purpose of obtaining advice or recommendations.

GSA FACA Regulations, 66 Fed.Reg. at 37736 (July 19, 2001). However, GSA FACA regulations are owed little if any deference by this Court. *See AAPS,* 997 F.2d at 913; *see also Public Citizen,* 491

U.S. at 440 n. 12, 109 S.Ct. 2558 (noting questionable weight of FACA regulations).

 This proposed exception is not supported by the statute or the case law. However, even if it were, defendants have not demonstrated that the federal contractors' employees that were members of the committees were providing advice on their contracts; indeed, it would appear from the record that the contractors' employees were giving advice on the NIF, a project that lay outside their contract work.

### E. Plaintiffs' Pattern and Practice as an Actionable Claim

Plaintiffs claim that DOE is engaged in a pattern and practice of convening committees in violation of FACA to advise it on the NIF project. Defendants suggest that a "pattern and practice" claim is not cognizable because the federal government has not waived sovereign immunity for such claims. Defendants clearly misunderstand plaintiffs' claim, which arises pursuant to the APA. Defendants are, perhaps, misled by plaintiffs' misplaced reliance on *Byrd* for the proposition that a practice of convening advisory committees in violation of FACA is actionable. In *Byrd*, the Circuit recognized the federal agency's practice of violating FACA in the context of considering whether plaintiff's claim for declaratory relief was moot. *See* 174 F.3d at 244. The Circuit concluded that declaratory relief would remedy some injury of plaintiff's, and might deter future violations of FACA. *Id.* The court's reasoning, however, gives no guidance as to whether a claim for a practice of violating FACA would be legally cognizable.

 Under the APA, plaintiffs may challenge a policy that constitutes final agency action as unlawful. *See* 5 U.S.C. § 702, 704, 706. Defendants have conceded that DOE has an ongoing policy of convening technical status review committees. Indeed, defendants have identified a written DOE order that governs its decision to convene status review committees without adherence to the requirements of FACA. *See* Def. Mem. at 14–16 (citing DOE Order 413.3). The issuance of a guideline or policy statement may constitute final agency action. *See Barrick Goldstrike Mines, Inc. v. Browner*, 215 F.3d 45, 49 (D.C.Cir.2000). For agency action to be final it must "mark the 'consummation' of the agency's decisionmaking process," and "must be one . . . from which 'legal consequences will flow.'" *Id.* (internal citations omitted). Here, DOE's policy determination is reflected in a written order that governs its activity, and is clearly not "of a merely tentative or interlocutory nature." *Id.; see also Payne Enters., Inc.,* 837 F.2d at 491 (D.C.Cir.1988) (policy is reviewable even where it is "informal, rather than articulated in regulations or an official statement of policy"). Further, DOE's refusal to comply with the requirements of FACA in its establishment of status review committees advising it on the NIF has legal consequences for plaintiffs, as non-profit organizations that have sought, and intends to continue seeking, access to documents subject to disclosure under Section 10 of FACA. *See Public Citizen v. Dep't of State,* 276 F.3d 634, 642 (D.C.Cir.2002) (where non-profit organization submitted and planned to continue submitting FOIA requests to federal agency, claim that agency's procedural policy violated the APA was reviewable). Here, the Court finds no "institutional interests" that would be served by deferring review of DOE's policy. *Id.*

 Defendants argue that plaintiffs' claim is not justiciable because courts should review DOE's FACA compliance on a case-by-case basis. *See* Def. Mem. at 41, n. 26 ("Whether the Act applies to a particular committee is a highly context-specific, fact-intensive determination."). However,

defendants have stated that DOE intends to convene status review committees that include employees of federal contractors without complying with FACA. As the D.C. Circuit recently commented in *Public Citizen v. Department of State*, 276 F.3d 634 (D.C.Cir.2002), where " 'the agency has stated that the action in question *governs and will continue to govern* its decisions, such action' " is reviewable. *Id.* at 642 (quoting *Better Gov't Ass'n v. Dep't of State*, 780 F.2d 86, 93 (D.C.Cir.1986)) (emphasis in original).

■■■ The Court considers only whether DOE's policy constitutes a "clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Here, however, the Court has determined that the scope of the status review committees' work is advisory in nature and is subject to FACA. Accordingly, the Court finds that the DOE policy is contrary to law. The Court enters a declaratory judgment that the agency's policy of establishing committees to advise it on the NIF without complying with FACA contravenes FACA. However, as previously explained, plaintiffs are not entitled to their requested injunctive relief on this claim because they have failed to demonstrate that 60 days notice of DOE's intent to convene a committee would redress the procedural injuries which they assert.

### CONCLUSION

The Court has carefully considered the parties' cross motions for summary judgment, the responses and replies thereto, the entire record herein, the oral argument of counsel, and the applicable statutory and case law. The Court concludes that plaintiffs have established standing for the declaratory relief requested as remedies for defendants' FACA violations with respect to the individual committees and with respect to DOE's practice of convening committees to advise it on the NIF

in violation of FACA. However, plaintiffs have established standing to seek only that injunctive relief that would require defendants to produce Section 10 documents and to include a disclaimer on reports of committees held to have been convened in violation of FACA. Plaintiffs have not established that two additional forms of requested injunctive relief—a 60–day notice of the department's intent to convene a committee to advise it on the NIF, and notice to the plaintiffs whenever the disclaimer is invoked—will redress the injuries of which plaintiffs complain. In light of the fact that the parties have not had an opportunity to brief the appropriateness of plaintiffs' request for notice when the disclaimer is invoked, the Court denies this requested relief without prejudice.

For the foregoing reasons, the Court enters summary judgment for plaintiffs, and against defendants, on plaintiffs' claims that defendants have acted in a manner that is contrary to law in violation of the APA by establishing and using the Rebaseline Committee and the February 2001 and November 2001 Status Review Committees in violation of FACA, and by implementing a policy of convening committees to advise DOE on the NIF in violation of FACA. *See* Compl., Claims 1 & 2; Supp. Compl., Claims 1 & 3.

The Court further grants summary judgment for defendants, and against plaintiffs, on plaintiffs' claim that defendants have acted in a manner that is contrary to law in violation of the APA by establishing and using the HEDP Panel in violation of FACA. *See* Supp. Compl., Claim 2.

An appropriate Order and Judgment accompanies this Memorandum Opinion and Order.

### *ORDER AND JUDGMENT*

Pursuant to Federal Rule of Civil Procedure 57 and Federal Rule of Civil Proce-

dure 58, and for the reasons stated by the Court in its Memorandum Opinion docketed this same day, it is hereby

**ORDERED** that plaintiffs' motion for summary judgment [51] is **GRANTED in part** and defendants' motion for summary judgment [55] is **DENIED in part** with respect to plaintiffs' claims that defendants have acted in a manner which is arbitrary, capricious and contrary to law in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, by establishing and using the Rebaseline Committee (Compl., Claim 1), and the February 2001 and November 2001 Status Review Committees (Supp. Compl., Claims 1 & 3), in violation of the Federal Advisory Committee Act ("FACA"), 5 U.S.C.App. 2; and with respect to plaintiffs' claim that defendants have acted in a manner which is arbitrary, capricious and contrary to law in violation of the APA by engaging in a practice of violating FACA (Compl., Claim 2); and it is

**FURTHER ORDERED** that defendants' motion for summary judgment [55] is **GRANTED in part** and plaintiffs' motion for summary judgment is **DENIED in part** with respect to plaintiffs' claim that defendants have acted in a manner which is arbitrary, capricious and contrary to law in violation of the APA by establishing and using the HEDP Panel (Supp. Compl., Claim 2); and it is

**FURTHER ORDERED AND ADJUDGED** that the Clerk shall enter judgment in favor of plaintiffs and against defendants on plaintiffs' claims that defendants have acted in a manner which is arbitrary, capricious and contrary to law in violation of the APA by establishing and using the Rebaseline Committee (Compl., Count 1), and the February 2001 and November 2001 Status Review Committees (Supp. Compl., Claims 1 & 3), in violation of FACA; and with respect to plaintiffs' claim that de-

fendants have acted in a manner which is arbitrary, capricious and contrary to law in violation of the APA by implementing a policy of convening committees to advise DOE on the NIF in violation of FACA (Compl., Claim 2); and it is

**FURTHER ORDERED AND ADJUDGED** that the Clerk shall enter judgment in favor of defendants and against plaintiffs on plaintiffs' claim that defendants have acted in a manner which is arbitrary, capricious and contrary to law in violation of the APA by establishing and using the HEDP Panel (Supp. Compl., Claim 2); and it is

**FURTHER ORDERED** that the Court **DECLARES** that defendants violated FACA with regard to the following committees, which were established by defendants to obtain recommendations and advice concerning the NIF, without complying with FACA—the Rebaseline Committee and the February 2001 and November 2001 Status Review Committees; and it is

**FURTHER ORDERED** that the Court **DECLARES** that the Department of Energy is implementing a policy of convening committees to advise it on the NIF in violation of FACA; and it is

**FURTHER ORDERED** that, within thirty days of this Order, the defendants shall produce to plaintiffs all of the documents and other materials to which plaintiffs are entitled pursuant to Section 10 of FACA with respect to the Rebaseline Committee and the February 2001 and November 2001 Status Review Committees; and it is

**FURTHER ORDERED** that in the event defendants distribute a copy of all, or a portion of, the reports produced by the Rebaseline Committee and the February 2001 and November 2001 Status Review Committees, or refer to one of these

committees' recommendations, either in hardcopy or any other written or electronic media, defendants must include the following statement, in at least the same size print as the rest of the text, at the beginning of the report or reference:

> Although the Committee which prepared this Report was subject to the Federal Advisory Committee Act (FACA), 5 U.S.C.App. 2, the Department of Energy (DOE) violated FACA in forming and operating the Committee. In particular, DOE did not comply with any of FACA's requirements to ensure the committee is open to the public, balanced in terms of the points of view represented, and free of conflicts of interest.

It is **FURTHER ORDERED** that plaintiffs' request for an order requiring defendants to notify plaintiffs 60 days prior to defendants' establishment of any advisory committee to review the NIF is **DENIED**; and it is

**FURTHER ORDERED** that plaintiffs' request for an order requiring defendants to notify plaintiffs whenever the disclaimer is invoked is **DENIED** without prejudice.